**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WINDOWIZARDS, INC., HARVEY | : | CIVIL ACTION |
| GOODMAN, Partner, and | : | |
| MOORE STREET ASSOCIATES | : | NO.  13-7444 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| CHARTER OAK FIRE INSURANCE | : | |
| COMPANY, Member of Travelers Group | : | |
| of Insurance Companies | : | |

**MEMORANDUM**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                          MARCH 27, 2015

Presently before the court is "Defendant Charter Oak Fire Insurance Company's Motion
for Partial Summary Judgment" (Doc. 28), "Plaintiffs' Answer to Defendant's Motion for Partial
Summary Judgment" (Doc. 29), the defendant's reply brief (Doc. 30), and the plaintiffs' sur-
reply brief (Doc. 32).  By its motion, Charter Oak Fire Insurance Company ("Charter Oak")
seeks judgment on three of the plaintiffs' claims arising from an insurance contract regarding:
(1) recovery of the lost rental value of a damaged building; (2) recovery of expenses caused by
the enforcement of building ordinances; and (3) bad faith.  For the reasons set forth below, we
will deny the motion.

## I.      FACTUAL AND PROCEDURAL HISTORY[1]

This motion involves a dispute over property insurance coverage between Charter Oak,
and the plaintiffs Harvey Goodman ("Mr. Goodman"), Moore Street Associates ("Moore

---

[1] All facts are viewed in the light most favorable to the plaintiffs.  Matsushita Elec. Indus. Co. v.
Zenith Radio Corp., 475 U.S. 574, 587–88 (1986).

Street"), and Windowizards, Inc. ("Windowizards").   Moore Street is a real estate holding company and owner of a land parcel with eight buildings.   (Doc. 29, Exh. 1, p. 17). Windowizards sold custom windows and doors from one of the buildings (the "Building") owned by Moore Street.  Id. at 21.  Moore Street operates a related business out of an adjacent building.  Id. at 17.  Mr. Goodman, along with his brother, Barry Goodman, were partners in both ventures.  Id. at 16.[2]

The dispute arose out of damage to certain roof trusses in the Building due to heavy snow accumulation on February 19, 2011.  Id. at 70.   The Building was covered at that time by a commercial property insurance policy (the "Policy") issued by Charter Oak.  (Doc. 1, Exh. A). Prior to the loss, Windowizards had been suffering some financial stress.  It had stopped paying rent and taking new orders in December 2010, and stopped all operations and vacated the Building in April 2011.  (Doc. 29, Exh. 1, p. 9, Exh. 2, pp. 50, 61, Exh. 4, pp. 36-38, 44-48). Between December 2010 and April 2011, it attempted to sell its remaining stock in the Building. (Doc. 29, Exh. 3, p. 43, Exh. 4, p. 38).   Although occupied by Windowizards at the time of the loss, the plaintiffs did not detect any damage to the Building until July 4, 2011, at which time they installed support beams to shore up the roof.  (Doc. 28, Exh. D, p. 67; Doc. 29, Exh. 1, pp. 70-71).   After Windowizards vacated the Building, and into 2012, Mr. Goodman and Moore Street also attempted to sell the remaining assets that Windowizards had left in the Building. (Doc. 29, Exh. 2, pp. 50-53).

---

[2] From the facts and the parties' briefs, we deduce that the plaintiff relevant to the issues raised in the motion for summary judgment is Moore Street.  See e.g. (Doc. 28, p. 4 n. 3 ("[b]y letter dated April 8, 2014, Plaintiffs' counsel confirmed that Windowizards is not presenting a claim for loss of business income in this litigation), p. 6, n.4 ("[o]nly Moore Street and Windowizards are named insureds on the Policy")).

The plaintiffs submitted their claim to Charter Oak on August 16, 2011, having previously submitted it to their current insurer which denied the claim as the loss predated its coverage period.[3]  (Doc. 29, Exh. 1, pp. 70-71, Exh. 7).  Several Charter Oak adjusters inspected the damage, including Don Giordano.  See   (Doc. 29, Exh. 12).  Both Charter Oak and the plaintiffs inspected the damage with various engineers and consultants at various times.  Id.  By early 2012, the plaintiffs began removing the interior walls, ceilings, and upper floors as well as most of the wiring and HVAC components from the Building in order to properly assess the damage to the trusses and to prepare for repairs.  (Doc. 29, Exh. 12, p. CHARTEROAK0552-553, Exh. 19, pp. 74-76, Exh. 31, Exh. 53, pp. 35-37). Charter Oak accepted coverage for certain damaged trusses and between January 9, 2012 and July 24, 2012 paid a total of $366,104 for repairs.  (Doc. 28, Exh. K; Doc. 29, Exhs. 30, 33).

In November 2012, Moore Street leased the Building to McCall Industries (the "McCalls") for a short period of time to temporarily store some inventory.  (Doc. 29, Exh. 2, pp. 40-41, 106-17).  At that time, there was no heat or electricity in the Building.  (Doc. 29, Exh. 53, pp. 35-37).  During a fire inspection in December 2012, the fire marshal directed the McCalls to vacate due to code violations from the use of improvised electrical connections originating from another building, propane space heaters, and the support braces shoring up the roof.  (Doc. 29, Exh. 2, pp. 118-19, Exh. 45, Exh. 46, pp. 66-68, 89-90).

In February 2013, after the demolition of the interior of the Building was completed, the plaintiffs found additional damage to the roof trusses and sought further payments from Charter Oak. (Doc. 29, Exh. 42, p. 2).  Charter Oak denied this renewed claim in a November 8, 2013 letter asserting that the newly found cracks were not due to snow damage but were "the result of

---

[3] The Charter Oak Policy was in effect until April 8, 2011.

wear and tear and deterioration of the over 50-year old trusses and are accordingly not covered by the Policy." Id. at 2.

On February 8, 2013, before the plaintiffs informed Charter Oak of the newly discovered cracks, they filed suit in the Philadelphia Court of Common Pleas alleging breach of contract and bad faith. (Doc. 1). On December 19, 2013, Charter Oak removed the case to this court. Id. On December 10, 2014, the parties consented to referral of the case to a magistrate judge to conduct all further proceedings. (Doc. 25). Discovery concluded on January 15, 2015 and the case is set for trial on June 15, 2015. (Doc. 26). Charter Oak filed this motion for partial summary judgment on January 29, 2015. (Doc. 28).

## II.    THE SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In conducting this analysis, the court must view all reasonable inferences drawn from the facts in the light most favorable to the non-moving party, however, the inferences "must do more than show there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586-88.  Where "reasonable minds can differ as to the import of proffered evidence that speaks to an issue of material fact, summary judgment should not be granted."  Gelover v. Lockheed Martin, 971 F. Supp. 180, 181 (E.D. Pa. 1997).

An issue is "genuine" under Rule 56(c) if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under

4

governing law.  Id.  In a summary judgment analysis, "[t]he moving party has the initial burden of demonstrating that no genuine issue of material fact exists."  Josey v. John R. Hollingsworth, Corp., 996 F.2d 632, 637 (3d Cir. 1993) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  After the initial burden is met, "the burden shifts to the nonmoving party to present evidence that there is a genuine issue for trial."  Id.  (citing Celotex Corp., 477 U.S. at 324).

## III.   DISCUSSION

In its motion, Charter Oak asserts that it is entitled to summary judgment on three issues raised in the plaintiffs' complaint.  First, it contends that it is not responsible for paying the fair rental value of the Building while it was damaged, as it remained tenantable and the plaintiffs did not lose any rental income due to the damage.  Second, it argues that it is not responsible for the increase in repair costs associated with upgrades mandated by building ordinances.  Third, it claims that there is no evidence that it engaged in bad faith.  We conclude that there are genuine issues of material fact regarding all three of these contentions.  Thus, we will deny the motion for summary judgment.

### A.   Loss of Fair Rental Value

The Policy contains "Deluxe Business Income Coverage" under which Charter Oak will:

> pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration".  The suspension must be caused by direct physical loss of or damage to property. . . .  The loss or damage must be caused by or result from a Covered Cause of Loss.

(Doc. 29, Exh. 52, p. 1).  The term "Business Income" includes "Rental Value," which is defined, *inter alia*, as the "[t]otal anticipated rental income from tenant occupancy of the premises" and the "[f]air rental value of any portion of the described premises which is occupied by you."  Id. at 9-10.  The term "Operations" is defined under the Policy as "[y]our business

activities occurring at the described premises" as well as "[t]he tenantability of the described premises." Id. at 9.  Thus, Charter Oak will pay, *inter alia*, lost rent due to untenantability arising from covered losses.

Charter Oak asserts that Moore Street is not entitled to recovery under this coverage since it did not suffer an "actual loss" or a "suspension of [ ] 'operations'," in that the Building remained occupied and it did not suffer any loss of rent.  Specifically, it points out that Windowizards stopped paying rent in December 2010 for reasons unrelated to the snow, that the plaintiffs then attempted to sell off Windowizards' remaining property from the Building, and finally, they leased the Building to the McCalls in November and December 2012.  Since either the plaintiffs or the McCalls used the Building until December 2012, it contends that the plaintiffs did not suspend their operations.  Similarly, Charter Oak argues that the history of the Building's use confirms that the damage did not interfere with its tenantability.

Moore Street claims that it had "anticipated [additional] rental income" before it became aware of the damage and argues that the Building was untenantable after the damage.  Specifically, it provides evidence that it had been planning to use the space as a flea market after Windowizards left and had been actively seeking tenants.  (Doc. 29, Exh. 1, p. 51, Exh. 3, p. 67, Exh. 2, pp. 68, 70, 98-99).  It also has an expert report detailing the rents that the Building could have reasonably earned based upon the plaintiffs' history at that location.  (Doc. 29, Exh. 36).  Moore Street points out that it only leased the Building to the McCalls for two months and, as it lacked heating or electricity at that point, it was not commercially tenantable.  Thus, Moore Street contends that the rental value coverage is triggered as it lost anticipated rent due to the Building's damaged condition.

We conclude that there are genuine issues of material fact regarding, *inter alia*, whether the Building was untenantable and, if so, whether the snow damage and subsequent interior demolition was a cause of the untenantability.  Charter Oak highlights this very issue in its reply brief when it contends that Moore Street's:

> inability to find a new tenant after losing its sole tenant Windowizards was not caused by the loss, but rather by the subsequent demolition of, *inter alia*, the Building's electrical and sprinkler systems in the summer of 2012 (after the Building had served its purpose as a liquidation center for old Windowizards merchandise), which rendered it unfit for tenancy.

(Doc. 30, p. 3).  Moore Street agrees that the interior demolition contributed to the Building's untenantability, however, it asserts that the demolition was necessary for full inspection of the damaged trusses and, thus, it was related to the snow damage.  Given these factual issues, we deny Charter Oak's motion on this claim.

**B.     Loss Due to Ordinance Enforcement**

The Policy also contains "Ordinance or Law Coverage" which provides remuneration "[f]or loss or damage caused by the enforcement of any ordinance or law that" "[r]equires the demolition of parts of the same property not damaged by a Covered Cause of Loss," "[r]egulates the construction or repair of buildings," and "[i]s in force at the time of the loss."  (Doc. 29, Exh. 54, p. 4).  However, under this coverage component, Charter Oak will:

> not pay for increased construction costs . . .
>
> (a) Until the property is actually repaired or replaced, at the same location or elsewhere; and
>
> (b) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed 2 years. We may extend this period in writing during the 2 years.

Id. at 5.  Thus, Charter Oak contends that in order for this coverage to be triggered, there must be:  (1) a loss "caused by the enforcement of [an] ordinance or law"; (2) the plaintiffs must have "actually repaired" the damage; and (3) that repair work must have occurred within two years of the loss.  It asserts that the plaintiffs cannot meet any of these three requirements, and it is, therefore, entitled to summary judgment.

Charter Oak first contends that "no Ordinance or Law has been enforced by Bristol Township with respect to the claimed damage from the snow load event."  (Doc. 28, p. 18).  The word "enforcement" is not defined in the Policy.  The Third Circuit Court of Appeals has stated that under Pennsylvania law:

> [t]he task of interpreting an insurance contract is generally performed by a court rather than by a jury.  The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument.  Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language.

Regents of Mercersburg Coll. v. Republic Franklin Ins. Co., 458 F.3d 159, 171 (3d Cir. 2006) (internal quotation marks and citations omitted).  Thus, we will decide the initial legal question regarding the interpretation of the word "enforcement."

In its motion, Charter Oak contends that no ordinance enforcement occurred since "no documentation was supplied by a government authority mandating any such code related work as a result of the snow load event."  (Doc. 28, pp. 19).  Moore Street argues in its response that the term should have a broader meaning not requiring an "arrest[] by the building code police." (Doc. 29, p. 44).  Instead, it asserts that it need only show that it was "required to demolish parts of the structure not damaged by the loss" and that there was an enforceable ordinance that regulated the repairs.  (Doc. 29, pp. 44-45).

8

While there is no clear precedent on the issue, the relevant case law favors a broad reading of the term "enforcement."   In Regents of Mercersburg College, 458 F.3d 159, a lightning strike and subsequent fire damaged the insured's building.  Id. at 162.  As here, the insured had purchased additional insurance coverage for losses "to the undamaged portion of the building caused by enforcement of any ordinance or law that . . . requires demolition of parts of the same property."  Id.  The insured sought payment under the code enforcement coverage for money it expended complying with, *inter alia*, the Americans with Disabilities Act and various building codes when fixing the damage to the building.  Id.  The Third Circuit determined that the insurer was obligated to pay any post-fire renovations that "were mandated by the ADA."  Id. at 170.  The court did not require an official to enforce the law by issuing a citation – all that it required was evidence that the renovation or modification was necessary under the law.

In discussing the building codes, the court specifically considered the meaning of the term "enforcement" and concluded that there had been no proof of enforcement of the codes since the insured "fail[ed] to point out any provisions of the building codes that mandated or required it to do any upgrades, renovations, etc., to the undamaged portions of" the property.  Id. at 172.  Thus, in this Circuit, it appears that for enforcement of a building ordinance to have effect under the Policy, it is enough that the ordinance mandate changes without an official taking any specific action.

Charter Oak cites two cases which actually support the plaintiffs' more expansive reading of the word "enforcement."   Those cases differ from this case in that they involved insureds unsuccessfully attempting to avoid policy provisions prohibiting damages arising from code enforcement, whereas here, the plaintiffs have specifically purchased such coverage.

In <u>Brandywine Flowers, Inc. v. West American Insurance Co.</u>, No. CIV. A. 92C-04-196, 1993 WL 133176 (Del. Super. Apr. 19, 1993) aff'd, 633 A.2d 368 (Del. 1993), West American refused to pay for business income loss which resulted from the time Brandywine Flowers spent obtaining zoning variances and building permits to restore its building after a fire. <u>Id.</u> at *1. The policy specifically excluded business income loss from "any increased period required due to the enforcement of any ordinance or law that . . . [r]egulates the construction, use or repair . . . of any property." <u>Id.</u> As in this case, the parties disagreed over the meaning of the word "enforcement" in the policy:

> West American maintains that the time required for "enforcement" of laws regulating construction and land use includes the time required to comply with those laws. Brandywine interprets the word "enforcement" more narrowly. It argues that there must be a violation of land use laws before there can be any enforcement of those laws. Brandywine never violated the County's zoning or construction ordinances and no governmental body ever undertook any enforcement action against Brandywine. Accordingly, Brandywine contends that the Policy exclusion does not apply.

<u>Id.</u> at *2. The court agreed with West American and concluded that:

> [t]he primary method of enforcing New Castle County's zoning and land use laws is through the process by which landowners obtain variances and building permits. . . . Brandywine would have violated the law if it had commenced reconstruction without first obtaining a building permit, [ ] and it had to obtain a variance in order to get the building permit. . . . Thus, it is plain that New Castle County's zoning and land use laws are enforced, in part, through the permitting process. Accordingly, the exclusion language applies to "enforcement" through building and zoning approvals.

<u>Id.</u>

Likewise, in <u>Bischel v. Fire Insurance Exchange</u>, 1 Cal. App. 4th 1168, 2 Cal. Rptr. 2d 575 (1991), the other case cited by Charter Oak, the insurer paid for damages to a boat dock but refused to pay for upgrades that were mandated by new municipal ordinances in light of the

policy exclusion for expenses arising from code enforcement.  Id. at 1170.  The court concluded that the enforcement of the ordinances did not require an "affirmative action of some sort."  Id. at 1177.  Instead, after defining "enforcement" as "the carrying out of a mandate or a command," the court held that "[i]mplementing building standards and withholding permits for construction in violation of those standards is how the city carries out the mandate or command of the municipal code provisions."  Id. (internal quotation marks and citations omitted).

From these cases, we conclude that enforcement begins with the passing of relevant ordinances and continues with either the granting or denial of a permit, or the issuance of a violation.  Moore Street does not dispute that it has not sought to have a code-compliant building plan approved by the township.  However, it alleges that it recognized the need for plan approval in light of various ordinances, that it attempted to discuss the issue of the code enforcement coverage with Charter Oak on several occasions, and that it began the interior demolition of the Building as recommended by its engineers and as required by the ordinances.  See (Doc. 29, Exh. 16, Exh. 19, pp. 43, 74-76; Exh. 26-2).  Thus, we conclude that the enforcement process had sufficiently begun in this case to trigger the ordinance enforcement coverage.

Having defined the term "enforcement" in the plaintiffs' favor, we must also review the other requirement of the coverage:  that the plaintiffs effectuate repair within two years.  Moore Street does not dispute that it did not meet this requirement, thus, there is no genuine issue of material fact regarding its adherence to the coverage conditions.   However, Moore Street contends that Charter Oak repudiated its obligation to indemnify it, causing an anticipatory breach of contract.  See Jonnet Dev. Corp. v. Dietrich Indus., Inc., 463 A.2d 1026, 1031 (Pa. Super. 1983) (providing that "an anticipatory repudiation by an obligor discharges an obligee's duty to perform a condition precedent") (citing Restatement (Second) of Contracts (1981) §§ 253

11

cmt. c & 255 cmt. b).  We conclude that there are genuine issues of material fact regarding this contention.

For example, Moore Street contends that it attempted to discuss code upgrade issues with Charter Oak's adjuster, Mr. Giordano, on many occasions, but that he refused to consider them in breach of his good faith obligations.  Specifically, Moore Street alleges that in a February 8, 2012 email, its public adjuster David Horowitz, from Young Adjustment Company, told Mr. Giordano that Moore Street needed an "engineer to detail any code compliant issues" and mentioned the additional truss damage that was recently discovered.  (Doc. 29, Exh. 16).  Mr. Horowitz, in a February 17, 2012 email, then asked Mr. Giordano to "expedite the approval of the engineering work so we can come to a prompt resolution of the scope of work and an agreed price."  Id.  Moore Street alleges that Mr. Giordano did not pursue these issues and did not even note the emails in his electronic log, which purpose was to record information the adjuster felt was pertinent to the claim.  See (Doc. 28, Exh. 12).  Moore Street similarly alleges that Joseph Markham, also of Young Adjustment Company, tried to discuss code upgrade coverage with Mr. Giordano numerous times but that he responded each time that "we're not here to talk about that. We're not going to discuss it.  That's not what we're here for.  They're only going to do what's been damaged.  That's it."  (Doc. 29, Exh. 19, p. 43).

Moore Street also alleges that Charter Oak anticipatorily breached by denying coverage on November 8, 2013 for the newly discovered truss cracks which it asserts were created by the snow damage.  It contents that the lack of appropriate funding prevented it from moving past the interior demolition stage to obtaining an engineering report, submitting code compliant plans to the township, and beginning the reconstruction.  We conclude, based on these allegations and the

evidence provided, that there are genuine issues of material fact regarding Charter Oak's alleged breach of the ordinance enforcement provision that prevent summary judgment on this issue.[4]

### C.   Bad Faith

Finally, Charter Oak seeks summary judgment on the plaintiffs' bad faith claim, alleging that they cannot meet the appropriate standard.  In order to establish bad faith under 42 Pa. C.S. § 8371, the plaintiffs "must show, by clear and convincing evidence: '(1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis.'" Gold v. State Farm Fire & Cas. Co., 880 F. Supp. 2d 587, 597 (E.D. Pa. 2012) (quoting Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997)). The plaintiffs are not required to show fraudulent conduct, however, "'mere negligence or bad judgment is not bad faith.'"  Nw. Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 137 (3d Cir. 2005) (quoting Brown v. Progressive Ins. Co., 860 A.2d 493, 501 (Pa. Super. 2004)).  A claim of bad faith may be premised on the insurer's improper investigation of the claim.  Gold, 880 F. Supp. 2d at 597.  Here, in light of, *inter alia*, Moore Street's evidence that Mr. Giordano mishandled the claim by purposefully refusing to discuss the code compliance coverage, we conclude that genuine issues of material fact prevent summary judgment on this claim as well.

### IV.   CONCLUSION

Genuine issues of material fact exist regarding all three of the claims on which Charter Oak seeks summary judgment:  (1) recovery of the fair rental value of the Building; (2) recovery

---

[4] Charter Oak disagrees that it improperly underfunded the plaintiffs' endeavors to obtain building permits and begin the rebuilding process.  It claims that the plaintiffs' lack of funds arose because they spent the insurance proceeds on non-related expenses.  The plaintiffs dispute Charter Oak's evidence on this issue and present Mr. Goodman's verification as evidence that the funds were properly spent.  See (Doc. 28, Exh. 5).  This too is a factual issue that cannot be resolved at this stage.

of the increased costs associated with ordinance compliance; and (3) bad faith.  Therefore, we will deny its motion for partial summary judgment.

      An appropriate order follows.