**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WINDOWIZARDS, INC., | : | |
| HARVEY GOODMAN, Partner | : | |
| and MOORE STREET ASSOCIATES | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | CIVIL ACTION NO. 13-07444-EL |
| | : | |
| CHARTER OAK FIRE INSURANCE | : | |
| COMPANY, Member of Travelers Group of | : | |
| Insurance Companies | : | |
| | : | |
| Defendant. | : | |

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2015, upon consideration of Defendant, Charter Oak Fire Insurance Company's Motion in Limine to Preclude Testimony of Certain of Plaintiffs' Expert Witnesses Pursuant to Fed. R. Evid. 702 and any response thereto, it is hereby ORDERED that the Motion is GRANTED and the Court orders the following:

1. Charles Pistorio, K. Daniel Miller, Stephen McIntyre, Christopher Green, and Joseph M. Markham are precluded from offering opinions as to the fairness and reasonableness of the scope and cost of the work alleged to be necessary as a result of the subject loss; and

2. Daniel Honig, P.E. is precluded from opining that the International Building Code requires all fifteen roof trusses contained in the Windowizards building to be replaced.

BY THE COURT:

_____

Judge Strawbridge

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WINDOWIZARDS, INC., | : | |
| HARVEY GOODMAN, Partner | : | |
| and MOORE STREET ASSOCIATES | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | CIVIL ACTION NO. 13-07444-EL |
| | : | |
| CHARTER OAK FIRE INSURANCE | : | |
| COMPANY, Member of Travelers Group of | : | |
| Insurance Companies | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT CHARTER OAK FIRE INSURANCE COMPANY'S MOTION IN LIMINE
TO PRECLUDE TESTIMONY OF CERTAIN OF PLAINTIFFS' EXPERT WITNESSES**

Defendant Charter Oak Fire Insurance Company ("Charter Oak"), by and through its attorneys, Butler Pappas Weihmuller Katz Craig LLP, hereby moves to preclude testimony of certain of Plaintiffs' expert witnesses pursuant to Fed. R. E. 702 for the reasons set out in the attached memorandum of law.

Respectfully submitted,

BUTLER PAPPAS WEIHMULLER KATZ CRAIG LLP

s/Michael J. McLaughlin
THOMAS S. BROWN, ESQ.
tbrown@butlerpappas.com
MICHAEL J. MCLAUGHLIN, ESQ.
mmclaughlin@butlerpappas.com
1818 Market Street, Suite 2740
Philadelphia, PA  19103
(215) 405-9191
*Attorneys for Defendant, Charter Oak Fire
Insurance Company*

Dated:  April 3, 2015

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WINDOWIZARDS, INC., | : | |
| HARVEY GOODMAN, Partner | : | |
| and MOORE STREET ASSOCIATES | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | CIVIL ACTION NO. 13-07444-EL |
| | : | |
| CHARTER OAK FIRE INSURANCE | : | |
| COMPANY, Member of Travelers Group of | : | |
| Insurance Companies | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CHARTER OAK FIRE INSURANCE COMPANY'S MOTION IN LIMINE TO PRECLUDE TESTIMONY OF CERTAIN OF PLAINTIFFS' EXPERT WITNESSES

Defendant, Charter Oak Fire Insurance Company ("Charter Oak"), by and through its attorneys, Butler Pappas Weihmuller Katz Craig LLP, hereby submits this Memorandum of Law in Support of its Motion in Limine to Preclude Testimony of Certain of Plaintiffs' Expert Witnesses pursuant to Fed. R. Evid. 702.

## PRELIMINARY STATEMENT

This is an insurance coverage litigation arising out of damage to certain roof trusses on the former Windowizards building in Bristol, Pennsylvania.

By way of background, Windowizards was a home improvement company focusing on window replacement, door and bathroom remodeling, siding and insulation. On December 11, 2010, Windowizards abruptly closed its business.

In June 2011, Plaintiff Harvey Goodman alleged to have discovered damage to the roof trusses of the Windowizards building that he had occupied for years previously. Windowizards and Goodman filed an insurance claim with Charter Oak Fire Insurance

Company alleging that the damage to the roof trusses occurred as a result of a snow loading event in February 2011, approximately the same time the company went out of business.

Windowizards has since sued Charter Oak for failure to pay this claim in the full amount demanded.   In support of their claims, Plaintiffs have submitted reports authored by a number of experts who opine, inter alia, on the reasonableness of the scope and amount of Plaintiffs' insurance claim.  These experts include:

1.      Charles Pistorio, President of MAC Sprinkler, Inc., opines that his company's quote for the installation of a sprinkler system in the amount of $54,500.00 is fair and reasonable.  (See Exhibit A:  Pistorio Quote dated April 29, 2014 and Exhibit B, Pistorio report dated August 28, 2014.)

2.      K. Daniel Miller of Dale Construction opines that his company's quote to install new roof trusses at a price of $569,690.00 is fair and reasonable.  (See Exhibit C: Dale Construction proposal dated May 7, 2014 and Exhibit D dated November 3, 2014.)

3.      Stephen McIntyre, President of Twining Construction Company, Inc., opines that the restoration work he suggests (including HVAC, electrical, plumbing, and "general trades") are necessary and his bill of $765,924.00 for completion of this work is fair and reasonable.  (See Exhibit E:  Quote by Twining Construction dated May 28, 2014 and Exhibit F:  Letter from McIntyre to R. Harrington dated August 26, 2014.)

4.      Christopher R. Green, Claim Manager with Richard Green & Son Public Adjusters, opines that the cost to restore the interior of the warehouse to its pre-loss condition is $583,028.01, and that the scope of the repairs in his estimate is reasonable and necessary.  (See Exhibit G:  Green report dated October 29, 2014.)

2

5.      Joseph M. Markham, an adjuster with Young Adjustment Company, Inc., who opines that the bids by Dale Construction, Twining Construction, and Richard Green & Son Public Adjusters are fair and reasonable. (See Exhibit H: Markham report dated November 3, 2014.)

6.      Daniel Honig, P.E., a structural engineer, opines, <u>inter alia</u>, that as a result of the damage to six of the fifteen roof trusses, all fifteen of the trusses must be replaced in order for the repairs to be brought in compliance with the applicable building codes. (See Exhibit I: Honig report dated October 8, 2013; Exhibit J: Honig report dated February 25, 2014; and Exhibit K: Honig report dated September 10, 2014.)

The contractors and public adjusters do not provide sufficient factual support for their opinions as to the need for the repairs or the reasonableness of the cost of this work. They simply provide conclusions and self-validate what they believe is required to return the Windowizards building to its pre-loss condition. In addition, Mr. Honig does not provide sufficient support for his contention that all 15 trusses need to be replaced pursuant to the applicable building code. As demonstrated below, these conclusions are not reliable and are not admissible under the applicable law governing the admissibility of expert testimony. Accordingly, these experts' opinions should be precluded under the Federal Rule of Evidence 702.

<u>**ARGUMENT**</u>

**I.      Standard of Review under Federal Rule of Evidence 702**

Federal Rule of Evidence 702 sets forth the admissibility requirements for expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in

issue, a witness qualified as an expert by knowledge, skill, experience or training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

F.R.E. 702.  In Daubert v. Merrell Dow Pharmaceuticals, Inc., the Supreme Court held that expert opinion testimony must be both reliable and relevant to be admitted into evidence.  509 U.S. 579 (1993).  This requirement applies to both scientific and non-scientific testimony.  See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147-48 (1999).  The Supreme Court has repeatedly stressed the role of the district court judge as a gatekeeper who must ensure that under Rule 702 the expert testimony is reliable and assists the trier of fact.  Kumho Tire, 526 U.S. at 152; Daubert, supra, 509 U.S. at 590.

It is the plaintiff's burden to prove that the opinion testimony of plaintiff's expert is admissible.  See Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1316 (9th Cir. 1995) ("Daubert II") ("the party presenting the expert must show that the expert's findings are based on sound science ..."); Dennis v. Pertek Computer Corp., 927 F. Supp. 156, 160 (D.N.J. 1996) ("it is the party seeking to admit expert evidence that must demonstrate to the court by a preponderance of proof that the opinion is reliable").  To meet this burden, a plaintiff's expert may not simply self-validate the reliability of his testimony.  "Nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert."  Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).  Rather, the plaintiff must come forward with objective proof that an expert's testimony satisfies the factors for admissibility.  Daubert II, supra, 43 F.3d at 1316.  If the plaintiff fails to

4

provide sufficient explanation and validation of the expert's methodology and reasoning, the Court cannot make the findings required by Rule 702 and should refuse to admit into evidence the expert's testimony.  Claar v. Burlington N.R.R., 29 F.3d 499, 502 (9th Cir. 1994) (holding that district court properly refused to admit expert evidence where experts failed to explain the reasoning and methods underlying their conclusions).

When evaluating expert testimony, the Court must first determine whether the expert's methodology is reliable.  Elcock v. Kmart Corp., 233 F.3d 734, 744 (3rd Cir. 2000).  "[T]his entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid."  Daubert, supra, 509 U.S. at 592-93.

The second question is whether the testimony is relevant to the facts at issue. Elcock, supra, 233 F.3d at 756.  The Third Circuit has characterized this inquiry as "whether [the] reasoning or methodology properly can be applied to the facts in issue." Id.  That is, whether the testimony of the expert "fits" the matter at issue.  The testimony does not "fit" if there is no basis or connection to the facts at issue.  See Daubert, 509 U.S. at 592-93.

The Third Circuit has explained that, "the 'ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's technique or principle [is] sufficiently reliable so that it will aid the jury in reaching accurate results."  In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 744 (3rd Cir. 1994).  "Any step that renders the analysis unreliable under the Daubert factors renders the expert testimony inadmissible."  Id. at 745.

## II.     Plaintiffs' Experts' Repair Estimates Are Not Reliable or Admissible Under Rule 702 as Expert Opinions

Plaintiffs intend to call five experts to establish the necessity of the scope of repairs and the reasonableness of the costs for which he seeks to recover under the policy.   Three of these experts are construction contractors and two are public adjusters.   As demonstrated below, the opinions proffered by these experts do not satisfy the requirements of Rule 702.

### A.     Contractor Bids:   Charles Pistorio, K. Daniel Miller and Stephen McIntyre

Three of Plaintiffs' expert "reports" are simply bids by contractors to perform the work that they contend is necessary to restore the building to its prior condition:  Pistorio (sprinkler contractor); Miller (roof truss contractor with subcontractor bids); and McIntyre (HVAC, plumbing and general trades).   These contractors simply provide quotations for the work they propose to do and, not surprisingly, opine that the work they propose is necessary and their bids are reasonable based on their experience.   Plaintiffs cloak these bids as expert reports.

Plaintiffs rely wholly on these contractors in support of their monetary claim for damages to repair the building.  While their experience as tradesmen may qualify them as competent to _perform_ the work they propose, experience alone is insufficient under Federal Rule of Evidence 702 to support expert opinions.   These witnesses may be competent to testify (as _fact_ witnesses) as to what they would charge a customer to perform the work at issue, but their opinions are not sufficiently supported to be admissible as _expert_ testimony on the issue of reasonableness as to the scope of the work and the cost to perform the work.

The testimony of a witness, who is well-qualified by experience, still may be barred if it is not based on sound data.  Montgomery Cnty. v. Microvote Corp., 320 F.3d 440, 448 (3d Cir. 2003).   Plaintiffs' contractor experts provide no empirical data, comparison with other contractor pricing, comparable bids or industry/regional statistics to support their opinions that their prices are reasonable.   Expert opinions must be supported by unbiased empirical evidence that logically provides a reasonable basis for the conclusions reached by the experts.    See Falcon v. State Farm Lloyds,  2014 WL 2711849, at *23 (W.D. Tex. No. 1:12-cv-491 June 16, 2014)  (precluding an expert's property damage estimate as unreliable where the expert "provided no documentation of his methods and thereby precluded any assessment of the accuracy of his conclusions.")

Moreover, the contractors self-validate the reasonableness of their quotes. These contractor bids do not have the necessary indicia of reliability since the experts intend to perform the work themselves.  They are not unbiased – they stand to profit handsomely if Plaintiffs engage them to perform the work.  These "expert reports" are in essence no-bid contracts of the type criticized frequently by the public when engaged in by public entities.

An expert's personal financial interest in the subject on which he is asked to opine strongly suggests the opinion lacks reliability, and is a factor courts have cited in refusing to admit the expert's testimony under Rule 702.  In Falcon, the District Court refused to admit expert testimony where the expert only sent samples to lab that he believed confirmed his conclusion and where the limited sample size was influenced by the expert's financial motivation.  The court explained, "[a] sample size determined by

[the expert's] financial motivations does not give this Court confidence in the reliability of [his] methods." Id. at 33, citing U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Location Union No. 3, AFL-C10, 313 F. Supp. 2d 213, 238 (S.D.N.Y. 2004) (excluding expert testimony when it relied on a biased sample of data that was skewed to reflect the desired conclusion). Assuming, *arguendo*, that this Court were to find that Plaintiffs are entitled to recovery for the scope of work in these estimates, the experts would receive payment for their quoted work should Plaintiffs actually complete the repairs. In this regard, the experts directly stand to benefit depending on the outcome of the litigation and the pricing of their estimates.

Accordingly, Charles Pistorio, K. Daniel Miller, and Stephen McIntyre should be precluded from offering expert opinions as to the fairness and reasonableness of the scope and cost of the work alleged to be necessary as a result of the subject loss because their opinions are not sufficiently supported to be objectively reliable and they are not unbiased.

**B.     Plaintiff's Public Adjuster Reports are Not Reliable**

    **1.     Christopher Green's Opinion is Not Reliable**

Christopher Green is a public adjuster. Similar to the contractor bid proposals, Green's expert report provides no empirical analysis or fact-based explanation for his conclusions as to the scope of the work he suggests as being necessary or the reasonableness of his pricing. The only difference between the contractors and Green is that Green does not propose to do the work himself (and thereby profit from his estimate).

Green does not provide support for his opinions, such as citing to industry

literature, actual independent contractor bids, or actual pricing for raw materials or labor. He simply states:

> It is my opinion that the scope of repairs in my estimate is reasonable and necessary and that the unit pricing is fair and reasonable and in accordance with what general contractors charged in Southeast Pennsylvania in 2011.

Exhibit G:  Green Report at p. 1.

Green does not explain <u>why</u> it is necessary to perform the work he suggests or <u>how</u> he came to his conclusions.  He does not provide any citation to pricing information from general contractors in 2011.  He does not explain whether his assumptions and pricing are standard in the industry, and he does not cite to any authority.

Green also relies on a computer program, Symbility, to determine the prices he sets out in his report.  However, Green has not set out any support for the accuracy of the Symbility program.  He has also not established that that the program has been updated or remains accurate (if it once was) since he began using it eight years ago in 2007.  (See Exhibit L: Green deposition testimony at 21:8 – 22:6).  In order to set a reliable foundation for his opinions based on a computer program, the accuracy of the program must be established.

Without any authoritative support for his estimate, Green's conclusions are "net opinions" and inadmissible under Rule 702.  <u>See</u> <u>Falcon</u>, <u>supra</u>, 2014 WL 2711849 at *19 (precluding an expert in an insurance coverage litigation where there was "…no general acceptance of Armstrong's [the expert] methodology in the scientific community. Armstrong based her extrapolation calculations on nothing more than her own intuition, she can name no study or article supporting her calculations.  Armstrong claims that this is just what industrial hygienists do; however, she cannot point to a single piece of peer-

reviewed literature approving her calculations or providing any bases for her methods.")

See also In re: Paoli R.R. Yard PCB Litig., 35 F.3d at 742 (an expert's opinion cannot be based on unsupported speculation.)

Accordingly, Christopher Green should be precluded from offering expert opinions as to the fairness and reasonableness of the scope and cost of the work alleged to be necessary as a result of the subject loss.

### 2.    Joseph Markham's Opinion is Unreliable

Joseph Markham's contribution to the Plaintiffs' expert analysis is to review the bids submitted by Twining Construction, Dale Construction, and Christopher Green, and to conclude, based purely on a self-validating analysis, that these bids are reasonable.

Markham states as to Twining's bid:

> At a cost of $683,364, this fit-out contract would come to approximately $52 per square foot of finished area.  As an experienced estimator, and having seen the office/showroom facility prior to its demolition, I feel the $52 per square foot is well within the $40 to $100 per square foot that is currently typical for the Greater Philadelphia area.  It is at the lower end of the range, while still including in its pricing the office mezzanine structure that is not typically considered in office fit-out scenarios.

Exhibit H:  Markham report at p. 2.

Markham provides no citation for his contention as to what the "typical" price in the Philadelphia area is or what is typically considered a "fit out scenario".  Markham does not explain how he can lump together the multiple scope of work in Twining's bid – involving numerous types of construction to flooring, walls, ceiling, HVAC, electrical, plumbing – into one square foot calculation to evaluate the reasonableness of the cost per square foot and how a broad range of $40 to $100 per square foot is an appropriate basis for his evaluation.  Without support, these conclusions are merely ipse dixit – net

opinions not supported by authority or any facts that can be independently verified.

Indeed, the vacuous nature of Markham's analysis is demonstrated by his deposition testimony where he essentially acknowledges that he just "rubber-stamped" his approval of the estimates provided by others:

> Q:    Okay. Wouldn't the best party to opine on the fairness and reasonableness of the Twining estimate to be somebody from Twining?
>
> A:    I was asked to talk about it.
>
> Q:    But wouldn't they be better equipped to answer that question than you?
>
> A:    You could say the same thing about Dale and Green.
>
> Q:    Yeah, right.
>
> A:    I was asked to comment on three estimates.  I put my comments out there.
>
> Q:    That's fine.  But I'm saying, wouldn't I be able to learn better about what fairness and reasonableness in their estimate by asking them how they put it together, what was in it?
>
> A:    I would think you would want to do that.

See Exhibit M: Markham Deposition Testimony at 93:1 – 94:5.

Markham actually conceded that he did not do anything to determine if the Dale bid (and by logical extension the other bids) was fair and reasonable, and he admitted that the contractor bids are not as accurate as they would be if the contractors believed they would be getting the work in the near future.

> Q.    Is there anything you did to determine whether the Dale proposal was fair and reasonable?
>
> A.    No.  I was really looking to establish if there was a number that appeared correct.
>
> Q.    Okay.

A.    The next best thing would be to go out – or the better thing would be to go out and get additional independent bids.  But there are time constraints for that, and I don't know who would be paying for it.

Q.    Do you know that Mr. Goodman paid for the Dale bid?

A.    I have no idea.

Q.    Okay.  I'm just saying, you know, in the normal course, does the owner normally pay for competitive bids?

A.    Normally, no, you do not pay for competitive bids, but the contractors put a substantial amount of money into assembling these bids, so the less chance they have, they feel that they will get the job, for less money, they'll invest in getting a good bid in, they will just push a bid up to know they're covered.

Q.    Right.  It's only when there's a realistic possibly of actually getting the job that you're going to get a contractor to sharpen his pencil, I guess you would say in the business?

A.    Yes.

Q.    And we're not at that point yet?

A.    I think any contractor coming into this now, would realize that this is not going to be a job that's given a go ahead in the next 60 days, so I don't think they'd be particularly interested in spending thousands of dollars in preparing the bid.

See Exhibit M: Markham Deposition Testimony at 66:3 – 67:20.

Likewise, with respect to Mr. Green's estimate, Markham notes that Plaintiffs' counsel advised him that Green utilized a computer estimating package called "Symbility," which Markham simply accepts as reliable and accurate.  (See Exhibit H: Markham report at pp. 2-3.)  However, as Markham readily conceded in his deposition:

- he has never used Symbility;

- he has never researched whether Symbility is reliable or has been recognized as standard in the industry (in fact, he "stayed away from it");

- he has no idea whether Green applied the program correctly; and

- he did not review Symbility's pricing database – presumably the key component to its reliability.

See Exhibit M: Markham Deposition Testimony at 94:18 – 96:9.

Markham's opinion that the estimates submitted by Twining Construction, Dale Construction and Christopher Green are fair and reasonable is based on speculation and guesswork, and is therefore not reliable or helpful to the finder of fact in this case. See Shannon v. Hobart, 2011 WL 442119 (E.D.Pa. 2011) ("An expert's opinion can be deemed reliable if it is 'based on the methods and procedures of science rather than on subjective belief or unsupported speculation,' thereby giving the expert 'good grounds' for his belief."), citing In re:  Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 (3d. Cir. 1994).

Courts in this Circuit and elsewhere have routinely held that conclusions derived from subjective observations and methodologies such as those used here by Mr. Markham fail to meet the reliability requirements of F.R.E. 702. For example, in Montgomery County v. Microvote Corp., 320 F.3d 440, 448-49 (3d Cir. 2003), the court rejected the testimony of defendant's proferred expert, which was based solely on documents prepared by an employee of defendant, who was not present during the election at issue, and who made a "reverse guesstimate" about the amount of time the voting machines were down, without measuring the actual election use data. The defendant's expert could not identify the source or basis of the document, relied on the documents prepared by the defendant's attorney, and did not independently corroborate the document prepared by the defendant.  Id. at 449.

Likewise, in Advo, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191, 1198-99 (3d Cir. 1995), an antitrust case, the court rejected expert testimony based on estimates

of average variable costs that had no foundation other than a self-serving statement by defendant's publisher that inserting circulars involves "extensive costs."  In Oddi v. Ford Motor Co., 234 F.3d 136, 156-58 (3d Cir. 2000), the Third Circuit noted that while Daubert does not require a paradigm of scientific inquiry as a condition precedent to admitting expert testimony, it does require more than a haphazard, intuitive inquiry. In Oddi, the proffered expert engineer posited two hypotheses on the issue under review. Id. at 156.  However, at deposition, the engineer testified that he never tested either hypothesis.   Rather, the opinions were based on nothing more than his training, experience and intuition.   Id. at 158.   It was therefore impossible for the Court to properly assess the reliability of the expert's methodology, and the district court properly excluded the proffered expert testimony.  Id.

Here, as in Advo and Oddi, there is no foundation in the record for Mr. Markham's opinions, and his own subjective conclusions may not be substituted as determinative of the reasonable and necessary scope and cost of work necessary as a result of the snow load event.  Markham's opinion does not meet the requirements of Rule 702 and therefore is not admissible.

### III.   Daniel Honig's Opinion as to the Need to Replace the Undamaged Roof Trusses is Not Reliable

Plaintiffs' experts determined that six of the fifteen Windowizards roof trusses were damaged.[1]  Mr. Honig opines, however, that the International Building Code (along with his "engineering judgment") requires the replacement of all fifteen roof trusses of the Windowizards facility, despite the fact that he admits that only six of the trusses were damaged.  (See Exhibit I:  October 8, 2013 Honig Report at p. 2 and Exhibit N:

---

[1]Honig states that trusses 1, 2, 3, 6, 9 and 13 were found to have damage.  Trusses 4, 5, 7, 8, 10, 11, 14 and 15 were not damaged.

Honig Deposition at 55:2-9).

The critical IBC section that Honig relies on in support of his opinion that the non-damaged trusses need to be replaced under the Code is IBC § 3405.  Section 3405.3 states in relevant part:

> 3405.3   Substantial structural damage to gravity load-carrying components…   Existing gravity load-carrying structural elements shall be permitted to be designed for live loads *approved* prior to the damage.  Non-damaged gravity load-carrying components that receive dead, live or snow loads from rehabilitated components shall also be rehabilitated or shown to have the capacity to carry the design loads of the rehabilitation design….

(See Exhibit J Honig February 25, 2014 report at page 4:  IBC Code).  Therefore, the Code requires undamaged trusses to be replaced only if they received loading from any of the damaged trusses.

In his deposition, however, Honig conceded that the undamaged trusses do <u>not</u> "receive dead, live or snow load" from any of the damaged trusses:

> Q.     Okay.   Next sentence says, "Non-damaged gravity load carrying components that receive dead, live, or snow loads from rehabilitated components shall also be rehabilitated or shown to have the capacity to carry the design loads of the rehabilitation design."
>
> Now in this case, we know that there were six damaged trusses and there were nine undamaged trusses.  Let's go with Truss 11.
>
> Does Truss 11 receive dead, live, or snow load from any of the other trusses?
>
> A.     It does not share its tributary load.
>
> Q.     So it does not receive dead, live, or snow load from any of the other trusses?
>
> A.     In terms of individual truss, you're right, the way the load's delivered.

(See Exhibit N:  Honig Deposition at 176:23-177:20.)

Later in his deposition, Honig tried to finesse his answer by opining that the Bristol Building Code Officials would not let the owner replace only the undamaged trusses, despite the fact that the Code sections he cites in his reports (3405.1 and 3405.3) do not require replacement.   Honig attempted to rationalize his finding by stating what he believes a Code Official would or would not approve. But when questioned on this contention, Honig admitted that he has never communicated with the Code Officials to verify this assumption, but rather it was based on his unsubstantiated opinion.  (Exhibit N:  Honig Deposition at 195:9 – 198:21).   When questioned at length to cite to a specific code provision to support his analysis, Honig could only support his opinion with assumptions and inferences.   Exhibit N at 185:18 – 198:20.   This type of analysis without confirmation of his assumptions does not pass the _Daubert_ test.   In the cited pages of the deposition, Honig attempted to rationalize his opinion concerning repairs to non-damaged trusses by discussing lateral bracing, but he never mentioned lateral bracing in his February 25, 2014 report as a reason to bring the non-damaged trusses up to code nor identified a specific code provision that discussed repairs to lateral bracing.   He does not – and cannot by the very nature of the term (lateral) – state that the lateral bracing is a "gravity load carrying component" subject to Section 3405.3.[2]

In _Oddi v. Ford Motor Company_, the Third Circuit found unreliable expert opinions that are based solely on his own inferences and intuition.    _Oddi,_ 234 F.3d at 158.  Like the expert in _Oddi_, Honig did not test his hypothesis that Bristol building code officials would not let the owner replace only the undamaged trusses.   He admittedly

---

[2]  The section of the IBC, 3405.3, that Honig relies on is addressed only to gravity load carrying components.  Other sections of Chapter 34 of the IBC are addressed to lateral loads.

never contacted the code officials to discuss his plans.  There is nothing that the Court can assess to determine if Honig's assumptions about what code officials would approve are accurate nor can the Court assess from his testimony if some other method of construction would be acceptable to the code officials.  See id. at 158 ("there is nothing here to submit to peer review, and it is impossible to ascertain any rate of error for [the expert's] assumptions…   Similarly, no standards control his analysis, and no "gatekeeper" can assess the relationship of [the expert's] method to other methods known to be reliable and the non-judicial uses to which it has been put).  See also Simmons v. Ford Motor Co., 132 Fed. Appx. 950 (3d Cir. 2005) (expert opinions derived from subjective observations and methodologies, which could not be replicated or verified through testable hypothesis, rejected as unreliable).

Accordingly, Honig's opinion as to the need to replace all of the roof trusses – including nine undamaged trusses – is not reliable because it is based on an incorrect reading of the Code and unsubstantiated assumptions.  See State Farm Fire & Cas. Co. v. Holmes Prods.,165 Fed. Appx. 182, 185, 2006 W.L. 228617 (3d Cir. January 31, 2006) (affirming District Court's exclusion of fire expert's opinion on causation because it was based on speculation and assumptions not supported by any scientific methodology.)  Honig's opinion is not reliable and should be excluded.

## CONCLUSION

For the foregoing reasons, Charter Oak Insurance Company respectfully requests that the Court enter an Order precluding Charles Pistorio, K. Daniel Miller, Stephen McIntyre, Christopher R. Green, Joseph M. Markham, and Daniel Honig, P.E. from offering the proposed expert testimony identified in the attached order.

17

Respectfully submitted,

BUTLER PAPPAS WEIHMULLER KATZ CRAIG LLP

s/Michael J. McLaughlin
THOMAS S. BROWN, ESQ.
tbrown@butlerpappas.com
MICHAEL J. MCLAUGHLIN, ESQ.
mmclaughlin@butlerpappas.com
1818 Market Street, Suite 2740
Philadelphia, PA  19103
(215) 405-9191
*Attorneys for Defendant, Charter Oak Fire
Insurance Company*

Dated:  April 3, 2015

## CERTIFICATE OF SERVICE

I, Michael J. McLaughlin, hereby certify that on this 3rd day of April, 2015, a true and correct copy Defendant's Motion in Limine to Preclude Testimony of Certain of Plaintiffs' Expert Witnesses and Memorandum of Law in Support thereof, electronically filed with the Court this day, has been served via the Court's Electronic Filing System upon the following counsel of record:

Roger J. Harrington, Esq.
Harrington & Caldwell, P.C.
One Penn Center - Suite 1055
1617 JFK Boulevard
Philadelphia, PA  19103
Attorney for the Plaintiffs

s/Michael J. McLaughlin_____
MICHAEL J. MCLAUGHLIN, ESQ.