IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

WINDOWIZARDS, INC.,              )
HARVEY GOODMAN, Partner and  )
MOORE STREET ASSOCIATES     )     NO.: 2:13-CV-07444-EL
                           )
           v.             )
                           )
CHARTER OAK FIRE INSURANCE   )
COMPANY, Member of Travelers Group )
of Insurance Companies         )

## ORDER

AND NOW, this      day of                 , 2015 upon

consideration of defendant's Motion in Limine to preclude testimony of certain of

plaintiffs' expert witnesses and plaintiffs' response thereto it is hereby ORDERED that

the Motion is DENIED.

BY THE COURT:

_____
                                     J.

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

**WINDOWIZARDS, INC.,**
**HARVEY GOODMAN, Partner and**
**MOORE STREET ASSOCIATES**

v.

**CHARTER OAK FIRE INSURANCE**
**COMPANY, Member of Travelers Group**
**of Insurance Companies**

)
)
)
)
)
)
)
)
)
)
)

**NO.: 2:13-CV-07444-EL**

## PLANTIFFS' ANSWER TO DEFENDANT'S MOTION IN LIMINE TO PRECLUDE TESTIMONY OF CERTAIN OF PLAINTIFFS' EXPERT WITNESSES

Plaintiffs, by and through their attorneys, Harrington & Caldwell, P.C., respectfully

request that this Honorable Court deny defendant's Motion in Limine to preclude

testimony of certain of plaintiffs' expert witnesses and in support thereof plaintiffs rely

upon and incorporate herein by reference the following Memorandum of Law and

Exhibits attached thereto as if set forth herein at length.

RESPECTFULLY SUBMITTED,
HARRINGTON & CALDWELL, P.C.
Attorney for Plaintiffs

By:_____
ROGER J. HARRINGTON, ESQUIRE
Identification No.   09885
1617 John F. Kennedy Boulevard
One Penn Center, Suite 1055
Philadelphia, PA  19103
Office@harringtoncaldwellpc.com
(215)  751-1135
(215)  751-1147- Facsimile

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

WINDOWIZARDS, INC.,　　　　　　　　　)
HARVEY GOODMAN, Partner and　　　　)
MOORE STREET ASSOCIATES　　　　　　)　　　NO.:  2:13-CV-07444-EL
　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
CHARTER OAK FIRE INSURANCE　　　　)
COMPANY, Member of Travelers Group　)
of Insurance Companies　　　　　　　　)

PLAINTIFFS' MEMORANDUM
OF LAW CONTRA DEFENDANT'S MOTION IN LIMINE

## I. Matter Before The Court

At issue is defendant's Motion in Limine to preclude certain testimony of certain

of plaintiffs' expert witnesses and plaintiffs' Answer thereto.

Plaintiffs pray that defendant's Motion be denied.

## II. Statement Of Issues Involved

A.  Should the Court preclude plaintiffs' damages experts (Charles Pistorio, K.

Daniel Miller and Stephen McIntyre) from testifying on their respective opinions on the

cost to restore parts of the subject building to preloss condition?

> Suggested Answer:  No, said damages witnesses should not be precluded
>
> from giving expert testimony consistent with their respective estimates
>
> and/or reports.

B.  Should the Court preclude Christopher R. Green from testifying on his opinion

of the cost to restore part of the subject building to preloss condition?

> Suggested Answer:  No, Christopher Green should not be precluded from
>
> testifying as an expert on the cost to restore part of the subject building to
>
> preloss condition.

C. Should the Court preclude Joseph Markham from testifying on his analysis of the estimates of Pistorio, Miller, McIntyre and Green?

> Suggested Answer:  No, Joseph Markham should not be precluded from testifying on his analysis of the estimates of Pistorio, Miller, McIntyre and Green.

D. Should the Court preclude plaintiffs' engineering expert, Daniel Honig, from testifying on why roof trusses not damaged in the loss have to be reinforced in addition to repairs to the damaged trusses?

> Suggested Answer:  No, Daniel Honig should not be precluded from giving testimony explaining why roof trusses not damaged in the loss should be reinforced in addition to repairs to the damaged trusses.

## III. Factual And Procedural History Relevant To This Motion

Plaintiffs' expert submissions to the defendant and additional items relevant to this motion are attached hereto as follows:

> Letter dated October 10, 2013 from Roger J. Harrington, Esquire to Michael J. McLaughlin, Esquire enclosing Mr. Honig's October 8, 2013 report and Appendix A attachment (Appendix B are oversized  structural repair and reinforcement design plans and specifications and are not included herewith)                                              1
>
> Letter dated July 3, 2014 by Roger J. Harrington, Esquire to Michael J. McLaughlin, Esquire (enclosing proposal dated May 28, 2014 by Stephen McIntyre of Twining Construction Company, Inc., proposal dated April 29, 2014 by Charles S. Pistorio of Mac Sprinkler, Inc., Stephen McIntyre's letter of May 15, 2014 describing his company, proposal dated May 7, 2014 by K. Daniel Miller of Dale Construction, LLC, with subbids attached)                                              2
>
> Proposal dated May 28, 2014 by Stephen McIntyre of Twining Construction Company, Inc. with Bid Sheets                                              3

2

Proposal dated April 29, 2014 by Charles S. Pistorio of Mac
    Sprinkler, Inc.        4

Stephen McIntyre's letter of May 15, 2014 describing Twining    5

Proposal dated May 7, 2014 by K. Daniel Miller of Dale
    Construction, LLC, including subbids by Safway and
    Crescent[1]        6

Mr. Honig's report dated February 25, 2014    7

Mr. Honig's report dated March 13, 2014    8

Mr. Honig's report dated September 10, 2014    9

Mr. Honig's C.V.    10

Letter dated November 7, 2014 from Roger J. Harrington,
    Esquire to Michael J. McLaughlin, Esquire enclosing
    list of plaintiffs' expert reports and reports and estimates
    not previously supplied    11

Report of Charles S. Pistorio, President of Mac Sprinkler,
    Inc. dated August 28, 2014    12

Report of K. Daniel Miller of Dale Construction dated
    November 3, 2014 (describing his background)    13

Report of Stephen McIntyre dated August 26, 2014 with
    attachment regarding Mr. McIntrye's background references
    and major projects completed by Twining Construction, Inc.    14

Report of Joseph M. Markham of Young Adjustment Company,
    Inc. dated November 3, 2014 and his C.V.    15

Report of Christopher R. Green dated October 29, 2014,
    his diagrams, estimate and C.V.    16

---

[1] The Crescent subbid was inadvertently not mentioned in Mr. Harrington's November 7, 2014 cover letter but it was nonetheless provided with Mr. Miller's May 7, 2014 proposal.

Attorney McLaughlin's letters (6) dated November 26, 2014
alleging insufficiency in the information provided by plaintiffs
for Mr. Markham, Mr. Green, Mr. Miller, Mr. Pistorio, Mr.
McIntyre and Mr. Sengpiel[2]                                                                17

Letter dated January 9, 2015 from Roger J. Harrington, Esquire
to Michael J. McLaughlin, Esquire responding to Attorney
McLaughlin's letters dated November 26, 2014                              18

Letter from Christopher Green dated December 12, 2014           19

Stephen McIntyre's letter dated December 12, 2014                    20

Charles S. Pistorio's letter dated December 15, 2014                 21

K. Daniel Miller's letter dated January 6, 2015                          22

Defendant conducted the oral depositions of Mr. Green, Mr. Markham and
Mr. Honig and plaintiffs attach hereto the following deposition transcripts,
with exhibits, except where exhibits are already listed above, or are not
discussed in the following brief:

Joseph Markham's deposition minuscripit dated
October 16, 2014 with Exhibits:                                             23

Horowitz Exhibit 8 (Young Adjustment
estimate by Joseph Markham)                                   24

Joseph Markham's deposition minuscript dated
January 9, 2015 with Exhibits:                                             25

Statement of Claim with attachments                      26

Dajon's truss estimate dated July 19, 2012              27

Photos (2) dated November 2, 2011                          28

Daniel Honig's deposition minuscript dated
January 9, 2015 with Exhibits:                                             29

2009 International Building Code, Chapter
34, pages 571-574                                                  30

---

[2] The report of Mr. Sengpiel and supplemental submission regarding Mr. Sengpiel are not provided herewith as
defendant does not mention Mr. Sengpiel in its Motion.

Christopher Green's deposition minuscript dated
    January 9, 2015                                                          31

Excerpts from the Jake Mello deposition dated
    June 5, 2014                                                             32

J.S. Held estimate by Jake Mello dated July 24, 2012                         33

Jake Mello's estimate dated December 12, 2014                               34

Dajon's truss estimate dated December 2, 2014                               35

Portions of Symbility website                                                36

Symbility Whitepaper                                                         37

Property coverage declarations stating Valuation Provision                  38

Deluxe Property Coverage Form endorsement                                   39

Excerpts from the Harald Greve deposition dated
    January 23, 2015                                                         40

Vertex report October 13, 2011                                              41

Kristie & Johnson article, "Investigating and Repairing
    Wood Bowstring Trusses"                                                 42

## IV. <u>Argument</u>

In <u>Kumho Tire Co., Ltd., et al. v. Carmichael</u>, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) the United States Supreme Court declared that the trial judge must perform a "gatekeeping" function with respect all expert matters, not just "scientific" matters. As "gatekeeper" the trial court requires proof that: (1) the proffered witness is qualified as an expert; (2) the expert will testify about matters requiring scientific, technical or specialized knowledge (i.e. the expert's process or technique used to formulate his opinions is reliable); and (3) the expert's testimony "fits" the facts of the case (i.e. is relevant). See <u>In Re Paoli R.R. Yard PCB. Lit.</u>, 35 F. 3d 717, 741-742 (3d

Cir. 1994).  Thus, the gatekeeping function requires the Court to ensure that the expert

is qualified and the proposed expert testimony is both reliable and relevant.

However, the standard under Rule 702 is not a high one and does not require

plaintiffs to prove their case twice: they do not have to demonstrate to the judge by a

preponderance of the evidence that the assessments of their experts are correct, they

only have to demonstrate by a preponderance of evidence that their opinions are

reliable.  See Oddi v. Ford Motor Company, 234 F. 3d 136, 145 (3d Cir. 2000).

Regarding the 8 factors listed by the Court in Daubert v. Merrill Dow Pharm., Inc.,

509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993) to be considered by the District

Court in assessing reliability the Supreme Court states in Kuhmo, supra, 526 U.S. at

141 that each factor may not be relevant to every reliability analysis and that the test of

reliability is flexible.   In addition, the list is not exclusive.  The relevance of the Daubert

factors depends on "the nature of the issue, the expert's particular expertise, and the

subject of his testimony."  Kuhmo, supra, 526 U.S. at 150.

Regarding "fit", the proffered expert testimony must assist the jury by providing it

with relevant information necessary to a reasoned decision of the case.  See In Re Paoli

R.R. supra, 35 F. 3d at 743.

However, this is a bench trial.

In Clark v. Richman, 339 F. Supp. 2d 631, 648 (M.D. Pa. 2004), wherein a class

of disabled individuals receiving medical assistance alleged that DPW violated their civil

rights by not providing medically necessary dental services, the plaintiffs filed a Motion

to Strike portions of the defense expert report claiming the expert's methodologies were

unreliable and did not fit the issues in the case. Because the case was to be tried

before the Judge without a jury the Court deferred its decision on the motion stating:

> "The court believes that these issues will best be resolved at trial rather than now in writing or following a Daubert hearing sometime prior to trial. As this case will be a bench trial, the court's "role as a gatekeeper pursuant to Daubert is arguably less essential." (Cites omitted). We remain cognizant that existing Third Circuit precedent does not indicate whether a district court's obligations to hold a Daubert hearing differ for bench trials. (Cites omitted). . . . [w]e recognize that existing Third Circuit case law does not indicate whether a decision to exclude expert testimony must be decided prior or subsequent to the bench trial. (Cite omitted).
>
> Consequently, we conclude that, in the absence of prohibition or direction from the Third Circuit, reliability and relevancy challenges to an experts' opinions may be considered during a bench trial. Id. Indeed, "vigorous cross-examination [and] presentation of contrary evidence" will provide the best means of attacking Sreckovich's report, see Daubert, 509 U.S. at 595, as opposed to the court's conducting a line-by-line analysis of the report now. If the court examined the report now as plaintiffs urge, the court's determinations regarding the veracity, reliability, or weight of isolated statements in the report would be without the benefit of the context to be provided by other evidence, the context in which the report as a whole must be considered."

See also SRP Management Corp., et al. v. Seneca Ins. Co., 2008 U.S. Dist.

LEXIS 19924 (E.D. Pa.) wherein defendant made a Daubert challenge to the insured's

expert on whether decay which lead to collapse was hidden from view. In that matter,

also a bench trial, the Court stated:

> "As several courts within the Third Circuit have recently noted: "In a bench trial, this Court's 'role as gatekeeper pursuant to Daubert is arguably less essential' because a judge rather than a jury is the fact finder." Gannon v. U.S., Slip Op., Civil Action No. 03-6626, 2007 U.S. Dist. LEXIS 52051, 2007 WL 2071878, *1 (E.D. Pa. July 17, 2007) (internal citations omitted) (quoting Clark v. Richman, 339 F. Supp. 2d 631, 648 (M.D. Pa. 2004)); see also Chase Manhattan Mortg. Corp. v. Advanta Corp, No. Civ. A. 01-507(KAJ), 2004 U S Dist. LEXIS 3933, 2004 WL 422681, *9-10 (Mar. 4, 2004). Those courts within this Circuit to have considered the issue have further found: "the Third Circuit has given no indication as to how and if Daubert hearings differ for bench trials. In the absence of prohibition or direction from the Third Circuit, reliability and relevancy challenges to an expert's opinions may be considered during a bench trial." Gannon, 2007 U.S. Dist. LEXIS 52051, 2007 WL 2071878 at *1; see also Clark, 339 F. Supp. 2d at 648-49; Chase Manhattan Mortg. Corp., 2004 U.S. Dist. LEXIS 3933, 2004 WL 422681 at *9-10.
>
> Based on the close proximity of this matter to trial and the fact that we are called upon to act both to decide the questions presented in this motion and ultimately to find the facts at issue in this case, we will defer ruling on this motion for the present. Within the context of trial, we will hear testimony and argument as necessary on the issues presented in this motion and rule as appropriate at that time. Indeed, as the court noted in Clark, reflecting on the Supreme Court's mandate from Daubert, "vigorous cross-examination and presentation of contrary evidence will provide the best means" of determining the extent

7

to which Mr Blitz's opinion should be admitted and considered in this matter. See *339 F. Supp. 2d at 648-49* (citations and quotations omitted)."

Plaintiffs respectfully submit that the same course be taken by this Court.

## A. Plaintiffs' Experts' Opinions On The Cost To Restore Plaintiffs' Building To Preloss Condition Are Reliable And Should Not Be Precluded

Defendant's Daubert challenge to plaintiffs' contractors' opinions on their

estimates of repair should be rejected. Defendant does not dispute that these proposed

witnesses (Charles Pistorio, K. Daniel Miller and Stephen McIntyre) are in fact qualified

to perform the work they propose at the prices they estimate. Defendant's brief, p. 6.

Defendant does not contend that their opinions are not relevant.

Strangely, however, defendant asserts they are not experts in their respective

fields and that their opinions on the cost to restore various portions of the building to

preloss condition are not expert opinions.

Defendant suggests that a lack of empirical data, in part, renders their opinions

unreliable. "Empirical" is defined as:

> 1.a. Relying upon or gained from experiment or observation.
>  b. Capable of proof of verification by means of experiment or observation.
> 2. Relying solely on practical experience and without regard for theory or system "

See Webster's New College Dictionary, Third Edition, 2008, p. 376.

Defendant does not suggest what types of "empirical" data a contractor must

present for his method of preparing an estimate to be deemed reliable. Based on the

definition of empirical plaintiffs suggest that these experts' reliance on their practical

experience in their own respective fields suffices as empirical data. Indeed, plaintiffs'

8

contractor experts reached their respective opinions in this matter using the same level of intellectual rigor they apply to their respective professions.[3]

Defendant also suggests that plaintiffs' contractor experts are unreliable because they did not provide bids from their competitors. However, to demand that a damages expert who is a general contractor provide his competitor's estimate to justify his own estimate is, simply stated, unrealistic.

What qualified contractor provides as a matter of course not only his bid to do the job but his competitor's bid as well in the hope that the customer will hire him? None, and to demand same just to prove his method of creating an estimate is reliable because his estimate is in line with other bids is unrealistic and not required by the law.

"Estimate" is defined as:

> "Vt (verb) 1. To calculate approx. the amount or extent of.
>         2. To form an opinion about:
>            EVALUATE.
> n (noun) 1. A tentative evaluation or rough evaluation or rough calculation of the cost
>            of a project.
>         2a. A preliminary calculation of the cost of a project.
>          b. The statement of such a calculation.
>          c. A judgment: opinion."

See Webster's New College Dictionary, Third Edition, 2008, p. 392.

An estimate, by definition, is an approximate valuation of the cost of a project.

In support of striking plaintiffs' general contractor experts' opinions on valuation defendant relies on the public adjuster estimate that was precluded in Falcon v. State Farm Lloyds, 2014 U.S. Dist. LEXIS 83040, 94 Fed. R. Evid. Serv. (CBC) 951 (W.D. Tex.). In Falcon the Court found the estimate by the public adjuster unreliable because, inter alia, he could not recall where he found smoke or soot damage (from a wild fire),

---

[3] Kumho, 526 U.S. at 152: The objective of Daubert's gatekeeping requirement is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

consulted no peer-reviewed articles on soot or smoke damage, failed to differentiate smoke damage from damage from other sources, failed to test the soot/smoke damaged contents items and failed to take measurements. His estimate was based on "personal experience" testifying "I did go room by room and I came up with total for each room in the home, I added them up and that's what it came to . . . of how long I thought it was going to take to clean the non-porous items in those specific rooms." His opinion on the necessity of replacing the roof was also precluded as he did not consult a metal roof manufacturer or research metal roofs or test any allegedly smoke damaged roof grommets.

Unlike the public adjuster in Falcon, Charles Pistorio, K. Daniel Miller and Stephen McIntyre, are contractors who regularly work in their respective fields and earn a living based on work they do in those respective fields.

To the extent defendant asserts that plaintiffs' contractor experts lack objectivity because they hope to get the work they have estimated then defendant attacks their credibility, not reliability. In Kannankeril v. Terminix, 128 F.3d 802, 809-810 (3d Cir. 1997) the District Court's determination that the expert's opinion on causation was not credible and was therefore precluded was reversed as that was deemed an improper exercise of its gatekeeping role. The Third Circuit stated:

> "The Kannankerils' burden is only to provide an expert opinion that is relevant and reliable and that will assist the trial of fact. As we have repeated above, issues of credibility arise after the determination of admissibility. Credibility is for the jury."

The record does not support defendant's contention that any of these contractors have a financial interest in the outcome of this matter. However, even if they did have such an interest, that would go to bias, not reliability.

Regarding the alleged lack of empirical data supporting plaintiffs' contractors' opinions on valuation and whether an expert's opinion should be precluded on that basis, the Court states in Schneider v. Fried, 320 F.3d 396, 406 (3d Cir. 2003), "Where there are other factors that demonstrate the reliability of the expert's methodology an expert opinion should not be excluded simply because there is no literature on point."

The sound data in this case relied upon by each expert renders the opinions of plaintiffs' respective contractor experts reliable and includes without limitation:

> a) Charles Pistorio: His qualifications, experience and personal familiarity with the subject sprinkler system from having serviced it before and after demolition of the interior warehouse (See Exhibit 21).
>
> b) K. Daniel Miller: His qualifications and experience (Exhibit 13), Mr. Honig's report of October 8, 2013, pages 13-14, Safway Shoring quote, Crescent Iron Works material quote, both subcontractors he has consulted and worked with in the past, Mr. Honig's photos and drawings and his own inspection of the building (Exhibit 22).
>
> c) Stephen McIntyre: His qualifications and experience (Exhibit 5), photos, diagrams, dimensions, site visit and walk through with Rusty O'Connor, sub-bids of other subcontractors as listed in bid sheet with whom Mr. McIntyre regularly consults, J.S. Held estimate, Mr. Honig's reports, Dajon report, Green's diagrams (Exhibits 3, 14, 20).

Methodology is defined as a body of methods, rules and postulates[4] employed by a discipline. See Oddi v. Ford Motor Co., 234 F.3d 136, 157, fn. 20 (3d Cir. 2000). Methods, rules and self-evident truths in the field of general contracting estimating include determinations on the cost of materials and labor to perform a certain task. For this, general contractors frequently rely on subcontractors. For example Mr. McIntyre

---

[4] "Postulate" defined as:

  n. (noun) 1. Something assumed without proof as being self-evident or generally accepted, esp. when used as a basis for an argument.
  2. A basic principle: fundamental element.
  3. *Math.* An axiom.
  4. A prerequisite: requirement.

See Webster's New College Dictionary, Third Edition, 2008, p. 884.

relies on several subcontractors including Mr. Pistorio as does Mr. Miller; and, for both, the subcontractor bids are from entities they typically rely upon for same. It is well accepted that Rule 703 permits experts to rely on hearsay so long as that hearsay is of the kind normally employed by experts in the field. See In re TMI Lit., 193 F.3d 613, 697 (3d Cir. 1999).

Defendant's damages expert, Jake Mello, also relied on a subcontractor's bid. His July 24, 2012 estimate (Exhibit 33) incorporated the subbid of truss contractor Dajon dated July 19, 2012[5] (Exhibit 27). This J.S. Held estimate by Mr. Mello formed the basis of defendant's total advance payments to plaintiffs.

Moreover, on December 12, 2014 defendant provided another estimate by Mr. Mello dated December 12, 2014 (Exhibit 34) which sets forth his opinion on the cost to repair the trusses in accordance with the scope of work outlined by plaintiffs' engineer Dan Honig which incorporated the truss repair bid from Dajon (Exhibit 35) revised to reflect the amount of work Mr. Honig opines in necessary to repair and reinforce all the trusses.

Defendant's expert estimators show that plaintiffs' contractor estimators followed the same methodology in producing estimates or approximations on the cost to restore the building to preloss condition.

Plaintiffs' general contractor, Miller, was guided by engineer Honig in the scope of his estimate and Mr. Honig opined in his email of March 13, 2014 (Exhibit 8) that this remediation project will require consulting and site engineering.

Not one of defendant's legal citations in its Motion addresses or even questions the reliability of general contractors to give opinions on their estimates of repair.

---

[5] Dajon's July 19, 2012 truss repair estimate was not based on any engineer's plan or specifications.

12

A case close to this issue is <u>U.S. Accu-Measurements, LLC v. Ruby Tuesday,</u>

<u>Inc.</u>, 2013 U.S. Dist. LEXIS 59888 (D.N.J. 2013) wherein plaintiffs audited defendant's

leases to determine if the restaurant chain was overcharged by its landlords. As

payment for its services, plaintiffs were to receive a contingent fee on whatever was

reimbursed to defendant by the landlords. Defendant made a <u>Daubert</u> challenge to the

plaintiffs' damages expert. The District Court observed at footnote 6:

> "In analyzing this issue, I am additionally inclined to grant some latitude because the sole
> issue is damages, as to which New Jersey law does not require absolute precision. See
> e.g. *Tressmar v. Grosner, 23 N.J. 193, 128 A.2d 467 (1957)* ("If the evidence affords a
> basis for estimating the damages with some reasonable degree of certainty it is
> sufficient.").

Likewise, in Pennsylvania, "The law does not require that proof in support of

claims for damages or in support of claims for compensation must conform to the

standard of mathematical exactness." <u>Smail v. Flock</u>, 180 A.2d 59, 62 (Pa. 1962).[6]

Indeed, the Court noted that a <u>Daubert</u> challenge to a valuation expert may differ

from a challenge to a causation expert. See <u>CB Aviation, LLC v. Hawker Beechcraft</u>

<u>Corp.</u>, 2011 U.S. Dist. LEXIS 128918 (E.D. Pa.) wherein defendant challenged the

qualifications and methodology of plaintiffs' expert. The Court rejected the <u>Daubert</u>

challenge stating:

> "Defendant's argument fails for a number of reasons. First, it focuses on only one of the
> Mitchell factors -- whether the methodology consists of a testable hypothesis--ignoring
> another relevant factor: the expert's experience. Unlike more rigid scientific testimony,
> valuation testimony relies heavily on the expert's knowledge and experience. See *Simon
> v. Weissmann, 301 Fed. Appx. 107, 116 (3d Cir. 2008)* (holding that valuation testimony
> need not be based on a method that could be "repeated or used on a day-to-day basis");
> *Greenberg v. Paul Revere Life Ins. Co., 91 F. App'x 539, 540-41 (9th Cir. 2004)* (affirming
> district court's decision to admit valuation testimony because it was "the 'kind of
> testimony, whose reliability depends heavily on the knowledge and experience of the

---

[6] See also, <u>Osterling v. Frick</u>, 131 A. 250, 251-252 (Pa. 1925), a claim for payment of architectural services, wherein
the Court stated: "While damages in such case cannot be based on a mere guess or speculation, yet, where the
amount may be fairly estimated from the evidence, a recovery will be sustained even though such amount cannot be
determined with entire accuracy . . . substantial justice is better than exact injustice . . . What the law requires is
sufficient data from which the damages can be assessed with reasonable certainty and not merely upon
conjecture . . . "

expert, rather than the methodology or theory behind it'" (quoting *United States v. Hankey, 203 F.3d 1160, 1169 (9th Cir. 2000))*. Mr. Blackburn has been appraising aircraft for over thirty years. (Blackburn CV 1-2.) His estimate of the difference between retail and wholesale prices for aircraft generally, as well as the discount applied to aircraft with structural damage, is based on extensive experience and is thus reliable."

Likewise, in this case, plaintiffs' general contractor experts rely upon their many years in their respective fields: Pistorio: 25 years (Exhibit 21); Miller: 30 years (Exhibit 13); McIntyre: 30 years (Exhibit 14). Their methods for reaching their respective opinions are factually supported, their methods reliable, and their testimony on the cost of repairs is relevant to the issue of damages. None are causation experts.

## B. Christopher Green's Proffered Expert Opinion Should Not Be Precluded

Defendant does not question the qualifications of Mr. Green or the relevancy of his expected testimony.

Christopher Green was hired by Harvey Goodman in April of 2012 (see his October 29, 2014 report, Exhibit 16) to prepare a diagram of the fit out portion of the warehouse. See Mr. Green's January 9, 2015 deposition minuscript, Exhibit 31, N.T. 11.

To prepare the diagram he conducted an onsite inspection and took measurements using a laser device. Exhibit 31, N.T. 12, 50. When he did so the fit out was intact including the pallet racks. Exhibit 31, N.T. 13, 26.

Following preparation of the diagrams in 2012 Mr. Green was asked to prepare an estimate to restore the area he diagramed, the fit out in the warehouse, to preloss condition. See October 29, 2014 report, Exhibit 16 and see Exhibit 31, N.T. 29.

Mr. Green returned to the site multiple times to prepare the estimate, despite the fit out having been removed, in order to reorient himself with the building and to discuss

14

the fit out areas with Rusty O'Connor, the site manager (Exhibit 31, N.T. 48) including discussing the pallet racks (Exhibit 31, N.T. 57).

To create the estimate he used software called Symbility, an estimating program used by Mr. Green since 2007. Exhibit 31, N.T. 21. The cost of pallet racks and slat wall storage was done by researching the costs on website print outs from the internet because Symbility did not provide these unit costs. Mr. Green then inputted this pricing into the program based on his research. Exhibit 31, N.T. 28, 52, 53.

Mr. Green's assignment in this matter did not include determining why the fit out was removed or why it has to be replaced. Exhibit 31, N.T. 27.

Part of creating the estimate using Symbility includes Mr. Green's input of the measurements of the area under repair. Exhibit 31, N.T. 32. The estimate describes the dimensions he inputted. Exhibit 31, N.T. 36.

Also inputted by Mr. Green is the task to be done in a particular room. Exhibit 31, N.T. 42. The program then computes the value of the task inputted by Mr. Green in accordance with the measurements also inputted by Mr. Green. Exhibit 31, N.T. 42.

In his October 29, 2014 report (Exhibit 16) Mr. Green states that his estimate represents the cost to restore the warehouse interior to preloss condition with like kind and quality building materials without deduction for depreciation.

Mr. Green testified that actual cash value is replacement cost less depreciation. Exhibit 31, N.T. 60, 61. Mr. Green did not calculate depreciation because framing and studs do not wear out and any depreciation would have been minor. Exhibit 31, N.T. 61.

15

Defendant does not contest Mr. Green's qualifications to give an opinion on the cost to restore the fit out to preloss condition. Rather, defendant argues that Mr. Green's opinion is not reliable. However, Mr. Green's methodology is indeed reliable.

Mr. Green conducted numerous onsite inspections and had discussions with Mr. O'Connor the site manager about the fit out areas including the pallet racks. Mr. Green diagramed the subject areas before they were dismantled based on measurements he took using a laser device.

Mr. Green's method to create the estimate included inputting measurements and tasks into estimating software called Symbility. For what Symbility did not have in its data base (pallet racks and slat shelving) Mr. Green found pricing from websites on the internet which he inputted into the program, all for the purpose of restoring the fit out to preloss condition.

As noted above, methodology is defined as body of methods, rules and postulates employed by a discipline. Oddi, supra. In the discipline of insurance estimating it is common for the estimator to rely on computer software. Defendant's estimator, Jake Mello, testified on June 5, 2014 that his final estimate (at that point in time) dated July 24, 2012 (Exhibit 33 hereto) included Xactimate unit pricing except where it incorporated Dajon's truss repair bid. See excerpts from Mr. Mello's deposition, Exhibit 32, N.T. 64-66.

In addition, plaintiffs' public adjuster in this matter, Joseph Markham, testified on October 16, 2014 (see minuscript attached as Exhibit 23), that he also prepared a preliminary estimate to repair the structure (Exhibit 23, N.T. 79) which was previously identified as Horowitz Exhibit 8 (Exhibit 24 hereto). This estimate was also generated

16

using estimating software. On January 9, 2015 at his second deposition (minuscript attached as Exhibit 25) he testified that Young Adjustment also used Xactimate. (Exhibit 25, N.T. 17).

Further support for the reliability of Mr. Green's use of Symbility is that he uses this estimating program in his everyday business as a public insurance adjuster. His Symbility generated estimates are continuously peer reviewed by the carriers to whom he regularly submits such estimates on behalf of his clients. This consideration fits squarely with at least two original Daubert factors: peer review and non-judicial use to which the method has been put.

Also, as shown by Mr. Mello's and Mr. Markham's computer generated estimates, this methodology is generally accepted in the insurance industry.

Information on Mr. Green's software, Symbility, is readily available on the internet. Portions of its website and a Whitepaper (attached as Exhibits 36 and 37) describe it as estimating technology for use in the property and casualty insurance industry. Its customers, in addition to Chris Green, include Farmers Insurance Group, Allstate and Chubb. Defense counsel did not ask Mr. Green how frequently the prices on the Symbility database are updated but the Whitepaper (Exhibit 37), page 1, first paragraph, shows the pricing database is updated monthly.

The Whitepaper confirms Mr. Green's testimony (Exhibit 31, N.T. 22) that the Symbility price database is based on region and that it reports pricing in 22,000 separate regions based on zip code (Exhibit 37, page 5 of 6).

The public adjuster in defendant's citation of Falcon v. State Farm Lloyds, 2014 U.S. Dist. LEXIS 83040, 94 Fed. R. Evid. Serv.951 (W.D. Tex.) was challenged on his

17

proffered opinion on the extent the insureds' home suffered smoke damage from a wild fire. His method on this issue was deemed unreliable including using his personal experience to estimate the amount to clean the smoke damage ("eyeballing") and to replace the roof. Whether he used computer software to generate an estimate is not stated in the opinion. If he did it was not subjected to Daubert.

In support of precluding Mr. Green's opinion defendant discusses the Falcon Court's (defense brief, pages 9-10) rejection of Marion Armstrong, an industrial hygienist. However, the rejection was partial. She was found qualified and was permitted to testify on the effect wild fires have on nearby residences, general hazards of smoke exposure and to critique the opinions of defendant's sample collections. However, to the extent her testimony was based on samples taken by another expert, Fields, whom the Court found unreliable, her testimony was equally unreliable and thus precluded. Plaintiffs herein are not relying upon the testimony of an industrial hygienist.

Perhaps a more helpful case on the reliability of Mr. Green's testimony is Judge Ambrose's opinion in Gallatin Fuels, Inc. v. Westchester Fire Ins. Co., 2006 U.S. Dist. LEXIS 1324 (W.D. Pa.) wherein Gallatin Fuels, Inc. was a loss payee under a property insurance policy issued by Westchester Fire Insurance Company to Mon View Mining Corporation for mining equipment used by the named insured. A mine where this equipment was located was flooded after Mon View failed to pay its utility bills. After denying coverage for Gallatin's loss Gallatin filed suit against Westchester for breach of contract and bad faith.[7]

---

[7] Ultimately, the Third Circuit Court of Appeals dismissed Gallatin's breach of contract claim finding that the policy had been cancelled before the loss occurred but upheld a $4.5 million bad faith award, reported at 244 Fed. Appx. 424 (3d Cir. 2007).

18

Defendant's proffered expert opined on the value of the mining equipment at issue. Plaintiffs challenged as unreliable the methodology of the defense expert to reach "actual cash value" of the subject property.

Regarding methodology, the Court looked first at the insurance policy which contained two provisions addressing valuation of covered property. The basis of payment for the mining equipment was stated in the policy to be "actual cash value."

To calculate actual cash value the expert determined the actual price to purchase a new machine identical or very similar to the damaged machine immediately before the loss occurred. He then deducted an amount for diminution in value of the machine based on wear and tear factors and his knowledge of the mining industry. Based on same he determined actual cash value of the equipment to be $2.3 million.

Plaintiffs argued that the expert's methodology had no basis in Pennsylvania law since, pursuant to Fedas v. Ins. Co. of State of Pa., 151 A.285 (Pa. 1930), actual cash value when not defined in the policy does not include a deduction for depreciation but rather, is the cost to replace the property as of the date of loss.

The Court ruled that plaintiffs were correct in so far as a loss was partial but not total. In this case plaintiffs claimed the loss was total and based on Pennsylvania law depreciation is a component of actual cash value in a total loss situation. The Court deemed the defense expert's methodology sound and denied plaintiff's Daubert challenge.[8]

The Court in Gallatin did not find the 8 point Daubert inquiry into methodology particularly helpful. Rather, the Court first looked at the policy at issue.

---

[8] In the various subsequent memorandum opinions which followed this one as well as the Third Circuit's non-precedential opinion, Judge Ambrose's ruling on this Daubert motion was never questioned.

19

The policy covering Moore Street provides the following with regard to measure

of damages on page 14 of 20 of the Deluxe Property Coverage Form endorsement

(Exhibit 39 hereto):

> "4. Loss Payment
>
> a. In the event of loss or damage covered by this Coverage Form, at our option, we
>    will either:
>    (1) Pay the value of lost or damaged property;
>    (2) Pay the cost of repairing or replacing the lost or damaged property, subject to b.
>        below;
>    (3) Take all or any part of the property at an agreed or appraised value; or
>    (4) Repair, rebuild or replace the property with other property of like kind and
>        quality subject to b. below."

The property coverage declarations (Exhibit 38 hereto) states at Valuation

Provision: Replacement Cost. On page 15 of 20 the Deluxe Property Coverage Form

endorsement (Exhibit 39) states:

> "7. Valuation
>    We will determine the value of Covered Property in the event of loss or damage as
>    follows:
>    a. At replacement cost (without deduction for depreciation) as of the time of loss or
>       damage, except as provided in b , c., d., e., f., g., h., i., j., k., l., m., n., o., and p.
>       However, property will be valued at the actual cash value at the time of loss or
>       damage until the property is repaired or replaced within a reasonable period of
>       time. This restriction does not apply to losses less than $10,000."

There is nothing unreliable about the methodology employed by Chris Green

whose opinion is based on his estimate to restore a portion of the subject building to

preloss condition based on replacement cost. This opinion is relevant to the plaintiffs'

cause of action for breach of contract based on defendant's failure to indemnify plaintiffs

for covered loss in accordance with the policy.

As the Supreme Court notes in Daubert v. Merrill Dow Pharmaceuticals, 509 U.S.

579, 596, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993), vigorous cross-examination and

presentation of contrary evidence are the traditional and appropriate means of attacking

admissible evidence.

To the extent defendant suggests that plaintiffs' expert's opinions are based on inaccurate evidence or otherwise are erroneous such concerns are addressed through cross examination and/or rebuttal evidence. See e.g. Larson v. Bondex, 714 F. Supp. 2d 535, 545 (E.D. Pa. 2010).

## C. Joseph Markham Should Not Be Precluded From Testifying On His Analysis Of The Plaintiffs' Estimates

Defendant does not dispute Mr. Markham's qualifications to give opinions in this matter nor the relevancy of his opinions. Defendant argues that Mr. Markham's analysis of the plaintiffs' other estimates lacks reliability.[9]

On the subject of the plaintiffs' other estimates, Joseph Markham's testimony is indeed reliable. Mr. Markham is not only an expert in insurance estimating but he is also an expert in construction and construction estimating[10]. He is uniquely competent to assess a loss from both the perspective of an insurance adjuster estimator as well as a general contractor and construction estimator.

On January 9, 2015 Mr. Markham testified on the significance of a software program like Xactimate to insurance companies. See testimony at Exhibit 25, N.T. 18-20:

N.T. 18

| 21 | Q. Now, you talked about |
| 22 | Xactimate as a program that insurance |
| 23 | companies like because the end product |
| 24 | comes out in a format that they --give |

N T. 19

| 1 | them the information that they want to |
| 2 | see. |
| 3 | My question to you is: What |

---

[9] Defendant does not challenge the other opinions of Mr. Markham in his report (Exhibit 15) including his opinions on building permits, costs of permits, government inspections and design fees.
[10] C.V. attached as Exhibit 15.

21

4      is that information? What are the
5      details that an insurance company is
6      looking for to try to understand or
7      assess a building damage estimate?
8      A.      Well, I'll tell you that the
9      different ways the contractors approach
10     estimates versus insurance companies, and
11     it's always a friction point between the
12     two. The insurance companies want you to
13     go into each space of a loss. And we'll
14     take this room as an example. You would
15     come in here and if it was completely
16     destroyed, you'd start at the top, and
17     you'd say, well, I need 16 recessed
18     incandescent lights. I need three
19     chandeliers. I need -- and I need two
20     acoustic tile grid ceiling that moved
21     down to the walls. You can see the
22     plaster, the paint. You have electrical
23     outlets. You have baseboard, you have
24     window trim, you have windows.

N.T. 20

1      And they like that to go
2      room-by-room through the structure to
3      develop the cost. And they want each
4      room identified specifically so that if
5      they choose to go into that area, if it
6      still exists, they can check on it.
7      That's how insurance companies do
8      estimates.
9              How contractors do estimates
10     is, they take -- if they have drawings,
11     they'll take the drawings, and if it's a
12     general contractor, he'll alert the subs
13     to come in and have a look at the
14     drawings. Each sub will come in, and
15     say, the framing sub, will look at all
16     the all of the wood that's required.
17     When I say "wood," that's the framing
18     wood, not the trim wood, which is a
19     finished carpentry company. You may have
20     different people doing those things. You
21     might have a carpet person come in.
22     But they don't say -- they
23     won't say, well, you need 30 lineal feet
24     of wood trim in this room. They'll say,

N.T. 21

1      basically, I've looked at these drawings,
2      and for the work outlined as follows, and
3      they'll give a rough designation of what
4      they're doing, all rough framing, say.
5      And I will provide the labor and material

22

```
6      for executing that work for X number of
7      dollars. It's like a fortune cookie,
8      here's the lump sum.
9               And then, they may have
10     exclusions. I don't include scaffolding,
11     the general contractors has, because
12     there are frequently multiple trades that
13     will use the same scaffolding, and it
14     doesn't make sense to have them each
15     coming in.
16              So they're remarkably
17     different in how these things are put
18     together. And it becomes very difficult
19     to take an insurance company estimate and
20     check it against a general contractor, a
21     construction contractor's estimate
22     because they're built differently."
```

Curiously, defendant in its brief at page 7 suggests that plaintiffs' contractor's

estimates would be more reliable if they included bids from the contractors' competitors.

Since proof of reliability of these estimates on that basis is completely unrealistic

plaintiffs proffer the testimony of Joseph Markham, who as noted above is uniquely

competent to address the reliability of the contractors' bids.

However, defendant now asserts that Joseph Markham's opinion on the

reasonableness of plaintiffs' experts' estimates is guesswork. Defendant ignores Mr.

Markham's expertise in the fields of construction and insurance estimating.

As the legal citations in the preceding arguments show, a valuation expert

frequently has only his expertise and experience upon which to base his opinion and for

this particular area, valuation, that is sufficient.

Defendant's citation of Shannon v. Hobart, 2011 U.S. Dist. LEXIS 13212 (E.D.

Pa.) concerned a Daubert challenge to a mechanical engineer whose opinion (that a

commercial mixing bowl lacked a particular bowl guard) was precluded because his

methodology was deemed unreliable by the Court. The subject expert was not a

valuation expert.

23

Defendant's citation of Montgomery Co. v. Microvote, Corp., et al., 320 F.3d 440, 448 (3d Cir. 2003) involved a defense expert who was the author of the Federal Election Commission's design performance and testing requirements. In affirming the plaintiff's jury verdict for damages based on malfunctioning voting machines, the Court affirmed, inter alia, the District Court's preclusion of the defense expert author described above. The District Court, after viewing the expert's videotaped deposition (which plaintiff's counsel did not even attend) stated, "I'm a little concerned about some things that were shown to him he didn't seem to know where they were from or what the source of them were. That, I find disturbing."

In the instant case, defendant has not pointed to any uncertainty or lack of knowledge from either of Mr. Markham's two depositions nor has defendant pointed out any data relied upon by Mr. Markham that was not reliable (other than what defendant argues in the first part of its Motion which argument lacks merit).

Defendant's citation of Advo, Inc. v. Phila. Newspapers, Inc., 51 F. 3d 1191 (3d Cir. 1995) involved plaintiff's claim that defendant engaged in a predatory pricing scheme to monopolize the advertising circular market in Philadelphia. In affirming summary judgment for defendant the Court noted that the plaintiff's expert's opinion was not supported by sufficient facts. There was no Daubert analysis.

Plaintiffs submit that Mr. Markham's proffered testimony on his analysis of the plaintiffs' contractors' estimates is reliable and should not be excluded.

## D. Plaintiff's Engineer's Opinion That All Trusses Must Be Reinforced (Not Replaced) Should Not Be Precluded

Defendant does not challenge the qualifications or the relevance of the proffered

opinions of plaintiffs' engineer, Daniel Honig. Defendant contends Mr. Honig's

methodology is unreliable.

Initially, plaintiff notes that defendant either misapprehends or purposefully

misrepresents Mr. Honig's opinion. Mr. Honig opines that because 6 trusses (1, 2, 3, 6,

9 and 13) of 15 were substantially damaged in the loss[11] Chapter 34 of the 2009

International Building Code requires, in addition to repair of these damaged trusses, that

the remaining trusses be **reinforced**, not replaced[12]. The need for "reinforcement" of all

the trusses (not "replacement") is set forth in Mr. Honig's report of February 25, 2014

wherein he states at p. 3:

> ". . . This structural analysis confirmed that in addition to repairing and/or reinforcing the six trusses containing confirmed visual damage, **all** of the existing undamaged trusses **need to be reinforced** in order for the repair work to comply with the applicable requirements of the 2009 IBC  In order to allow for safe re-occupancy of the building and IBC compliance, the existing roof trusses need to be repaired and/ or reinforced according to the design documentation attached to my original report." (Emphasis added).

The structural analysis referred to in Mr. Honig's report is a computer analysis

called Rapid Interactive Structural Analysis for Two Dimensional Planar Structures

(RISA-2D). Using this analysis Mr. Honig calculated the truss capacity and ability to

carry the anticipated service loads within allowable stresses and deflections. Load

analysis criteria were taken from the ASCE 7-05's "Minimal Design Loads for Buildings

and Other Structures".

See Mr. Honig's October 8, 2013 report, Exhibit 1, p.9.

At p. 10 of his report (Exhibit 1) Mr. Honig states:

---

[11]  Exhibit 1, p. 8; Exhibit 7, p.2.

[12]  Mr. Honig also found the same damage to T5, See Exhibit 1, p. 8 and Exhibit 7, p.2.

25

> "RISA-2D computer analysis of the truss revealed that for all load cases and combinations, the top chords were found to be structurally adequate. Although all the top chord members were found to be within stress tolerances, several web members and all of the bottom chord members were found to be overstressed for various load cases. In fact, under the two worst cases (dead load with design uniform snow load and dead load with unbalanced snow load), the bottom chord members were found to be significantly overstressed by a factor of two, meaning they could only safely resist half of the current code-defined snow load when under design uniform and unbalanced snow loads. Analysis of the trusses revealed localized (i.e. at the skylights) snow drifting loads to be incidental compared to the total loads and related overstress."

At p. 12 of his October 8, 2013 (Exhibit 1) report Mr. Honig summarizes as

follows:

> "...Therefore, six of the fifteen total trusses were found to contain full-depth cracking and failure throughout the bottom chord as a result of overstress. Given the damage conditions observed to date, in combination with our computer analysis and confirmation of significant bottom chord overstress, it is clear that all of the existing trusses require structural **reinforcement**." (Emphasis supplied).

Moreover, the professional article entitled "Investigating and Repairing Wood

Bowstring Trusses" by Richard J. Kristie and Arne P. Johnson (the Kristie and Johnson

article) referenced at footnote 3 in the report of defendant's first engineer, Vertex[13],

recommends computer analysis of the truss system. This professional article also

states, "All members and connections of all trusses should be visually inspected for

indications of defects or distress." (Exhibit 42, p. 28). The defense expert, Mr. Greve,

also deemed this article authoritative and he also relied on it. See excerpts from Mr.

Greve's deposition, Exhibit 40, N.T. 71-73.

In addition, the defense engineer, Mr. Greve, used the same computer analysis

as Mr. Honig. Mr. Greve agreed this computer program was generally accepted in the

engineering field. See Exhibit 40, N.T. 101-103.

In addition to misstating Mr. Honig's opinion on repairs defendant incompletely

cites Section 3405.3 of the International Building Code. The complete code section

---

[13] See report of Vertex dated October 13, 2011, Exhibit 41 hereto, p. 4 of 7, footnote 3.

3405.03 of Chapter 34 of the 2009 International Building Code states as follows and the

portions omitted by defendant are boldly italicized:

> **3405.3 Substantial structural damage to gravity load-carrying components.** *Gravity load-carrying components that have sustained substantial structural damage shall be rehabilitated to comply with the applicable provisions of this code for dead and live loads. Snow loads shall be considered if the substantial structural damage was caused by or related to snow load effects.* Existing gravity load-carrying structural elements shall be permitted to be designed for live loads approved prior to the damage. Nondamaged gravity load-carrying components that receive dead, live or snow loads from rehabilitated components shall also be rehabilitated or shown to have the capacity to carry the design loads of the rehabilitation design. *New structural members and connections required by this rehabilitation design shall comply with the detailing provisions of this code for new buildings of similar structure, purpose and location.*[14]

Also noteworthy is Section 3405.2 which states:

> "A building that has sustained substantial structural damage to the vertical elements of its lateral force-resisting system shall be evaluated and repaired in accordance with the applicable provisions of Section 3405.2.1 through 3405.2.3."

Thus, Mr. Honig's evaluation of this structure is mandated by the Code and by

hiring Mr. Honig to evaluate the building and design repairs plaintiffs commenced their

journey to become code compliant.

Section 3401.3 of the 2009 IBC requires that repairs to existing buildings comply

with the Code and it is Mr. Honig's opinion that because of substantial structural snow

load damage to at least 6 of the 15 trusses then the foregoing Code section 3405.3

requires reinforcement to all the trusses, not just the damaged trusses.

Mr. Honig testified as follows (Exhibit 29):

N.T. 55

```
2            Q.      Now, it is your
3       recommendation that even though you've
4       identified 6 of the 15 trusses that have
5       serious structural impairment, it is your
6       recommendation that all of the trusses
7       need to be repaired; is that correct?
8            A.      Yeah That's both an
```

---

[14] A complete copy of Chapter 34, Existing Structures, of the 2009 IBC is attached as Exhibit 30. Another copy of Section 3405 in a different, easier reading format, is also provided.

27

9      engineering judgment and a code
10     requirement.
11             Q.     Okay. Let's start with the
12     engineering judgment.
               Why is that your engineering
14     judgment?
15             A.     It's my engineering judgment
16     because if you look at a truss system,
17     especially a bow truss system which has
18     very special strengths and weaknesses,
19     any one truss that is weaker than the
20     rest, is a weak link in that structural
21     chain and the three dimensional format
22     that those trusses are configured in.
23             In other words, the truss
24     itself may be an individual element,

N.T. 56

1      Trusses 1 through 15, but they only work
2      as a system when they're adequately
3      braced throughout and they're of
4      equivalent structural support value or
5      capacity.

N.T. 57

2              Q.     So I think you referred
3      to -- there's 15 roof trusses, and I
4      think the word you used to refer to them
5      is a "chain"?
6              A.     Yes.
7              Q.     How is it that they're
8      dependent upon each other?
9              A.     They're dependent upon each
10     other in the third dimension. In other
11     words, each roof truss is actually a
12     vertical plane that is in the shape of a
13     bowstring, and they're all set up
14     vertically adjacent to each other, like
15     20 feet apart.
16             Any time that any one truss
17     or any one component of the truss is not
18     adequately laterally braced, which means
19     that in the third dimension -- this would
20     be the long way, sort of looking through
21     perpendicular to the vertical plane. If
22     the system is not properly braced, then
23     any one of those trusses, even if itself
24     is load capable, can fail very easily.

N.T. 58

1              Q.     But assuming that it's
2      properly laterally braced, meaning that
3      the truss doesn't fall over, doesn't flip

28

```
4      one way or the other, does the load
5      that's on -- let's pick Truss 3, for
6      example.
7              Does the load that's on
8      Truss 3, is that load also on Truss 4?
9          A.    No, it's a similar load.
10         Q.    It's a similar load, what we
11     call chain load?
12         A.    Not the same load, no. It's
13     what we call a tributary load that is
14     placed on the truss.
15             But it's not so much the
16     truss falling over as it is a truss
17     component able to move laterally.
18     Because all I have to do is have one
19     joint go, which was exactly what was
20     showing up in the showroom area.
21             I can have one truss deform
22     and move at a joint not affecting the
23     adjacent truss if it stays within certain
24     parameters. But it's compromised and
```

N.T. 59

```
1      it's lost its structural support
2      capacity.
```

N.T. 61

```
21         Q.    Now, you've reached
22     conclusions based upon computer modeling
23     that, if I remember correctly, the bottom
24     chord of each of the trusses was not
```

N.T. 62

```
1      capable of carrying I think even
2      50 percent of the current load required
3      by code.
4              Is that a fair summary?
5          A.    Yes. It was not just the
6      bottom chord. It was also the webs.
7          Q.    The webs, okay  So the
8      bottom chord and the webs of each of the
9      trusses could not carry even half of the
10     load required by current code?
11         A.    Right. In other words, they
12     were double loaded. They were loaded to,
13     you know, 200 percent as opposed to a
14     hundred percent. And in fact, our field
15     notes reflect where those bottom chords
16     broke.
```

29

When Mr. Honig's testimony supports defendant's argument it is cited verbatim.
Defendant brief, p. 15. When Honig's testimony does not support defendant's argument
it is paraphrased and brushed off by defendant as "finesse". Defendant brief, p. 16.
The actual testimony of Mr. Honig paraphrased by defendant does not support
defendant's contention.

Defendant asserts that since Mr. Honig agrees that an individual truss does not
share load with any other truss then repair to non-damaged trusses is not required by
the Code.

However, defendant misapprehends (or purposely misrepresents) Mr. Honig's
testimony. First, as Mr. Honig testified at N.T. 176-177 (cited by defendant) a truss
does not share its tributary load with another truss in the way the load is delivered.
However, see Mr. Honig's testimony cited above at N.T. 58-59.

The testimony of Mr. Honig not cited verbatim by defendant, inartfully
paraphrased by defendant as "finesse", includes the following:

N.T. 185

18          Q.  So if 3405.3 does not
19     require us to upgrade non-damaged roof
20     trusses to current code requirements,
21     what is the basis for your opinion that
22     the code requires that Trusses 4, 5, 7,
23     8, 10, 11, 12, 14, 15 need to be upgraded
24     to withstand current loading
N.T. 186

1      requirements?
2               A.       I think we're having a
3      difference of reading of 3405.3
4               Q.       Okay.
5               A.       Read again what it says:
6      "Substantial structural damage to gravity
7      load carrying components. Gravity load
8      carrying components that have sustained
9      substantial structural damage shall be
10     rehabilitated to comply with the
11     applicable provisions of this code for

30

12      dead and live loads." That's obviously
13      2009 ASCE 7 specified code which we use
14      for RISA modeling.
15              Then it says, "Snow load
16      should be considered if the substantial
17      structural damage was caused by or
18      related to snow load effects," which
19      clearly it was.
20              Q.      Yep.
21              A.      That's what we're talking
22      about.
23              Then it says, "Existing
24      gravity load carrying structural elements

N.T. 187

1       shall be permitted to be designed for
2       live loads approved to the damage" --
3               Q.      Prior to the damage.
4               A.      Prior to the damage, sorry.
5               "Non-damaged gravity load
6       carrying components that receive dead,
7       live, or snow loads from rehabilitated
8       components shall also be rehabilitated or
9       shown to have the capacity to carry the
10      design loads of the rehabilitation
11      design.
12              And I think the
13      misunderstanding here is that, yes, the
14      tributary load from one truss to another
15      is not shared, but the bracing from a
16      damaged truss that is rehabilitated to
17      brace the adjacent truss that does still
18      have to pick up a tributary load is part
19      of the repair. I think that is exactly
20      the gray area that's being missed here.
21              In other words, this is a
22      system. Remember, right before, I said
23      it was a three-dimensional system? This
24      is not like I can go in there, and if I

N.T. 188

1       did it, I would be laughed at.  The code
2       official would say, you're not getting a
3       building permit here is.
4               What you're suggesting, if
5       we were to follow your logic and your
6       interpretation of 3405.3, is that somehow
7       we would have a building that actually
8       had different live loads ascribed to
9       different building areas.  That would
10      never happen. That would be like having
11      a pressure vessel that served one wall,
12      has a different value from another wall,
13      but yet the ASME code requires that the

31

```
14    entire pressure vessel be rated for X.
15            That is exactly the issue
16    here. No building code official would
17    ever issue a permit, they would never
18    issue a certificate of occupancy for it,
19    no engineer would even countenance - and
20    there were three other engineers that had
21    the same recommendation . . .
```

Because Mr. Honig was charged with rehabilitating the building (and not

engineers Zambrowski, Vertex or Greve, N.T. 189-190) he would not repair just the 6

damaged trusses and leave the rest of the trusses untouched.  He stated:

N.T. 190

```
5             A.  That's not the point.  The
6     point is, if we're charged with
7     rehabilitating the system, not just six
8     damaged trusses and leaving nine
9     undamaged, that's tantamount to actually
10    having two different roof loads in the
11    same building for two different areas.
12    That's never done.
        *                *                *
```

N.T. 191

```
11            A.      This is about a
12    three-dimensional building truss system
13    that is being rehabilitated that I can't
14    have -- even though one truss has an
15    individual tributary load that's
16    different from the adjacent truss, the
17    whole system has to be rated to the same
18    building loading."
```

Mr. Honig agreed, upon defense counsel's suggestion that if only one truss was

damaged, i.e. truss 1, and the rest of the building and bracing is fine then it is

acceptable to repair only that truss.  However,

N.T. 192

```
21            But that's not the case
22    here.  The case here is, I've got six
23    trusses, and they're sprinkled. -- yes,
24    they're front-loaded toward the front of
```

N.T. 193

```
1     the building, but they're also sprinkled
```

2    as far back as 13 and 6. So I obviously
3    have a typical problem and a typical
4    condition throughout the trusses, even
5    though the trusses receive different
6    tributary loads. They each have their
7    own individual ones would be a better way
8    of saying it. That's the issue.
9           And no code official and no
10   engineer, and I can't imagine any of the
11   other engineers even doing it. And I
12   know Russ, and I have seen Vertex.
13   Nobody would wing it that way.  . . .

Mr. Honig relies on the 2009 IBC Sections 3405.1 and 3405.3 for his opinion that

all the remaining trusses require reinforcement when the 6 damaged trusses are

repaired.

Contrary to defendant's paraphrasing of the basis of Mr. Honig's opinion

(defendant's brief, p. 16, "assumptions and inference") Mr. Honig's actual testimony is

as follows:

N.T. 195

9           Q.    Sir, going back to your
10   February 25th, 2014, report that we've
11   marked as Exhibit 6, the substance of
12   your opinion that code requires that
13   undamaged roof trusses be upgraded to the
14   current code loading requirements, that's
15   contained in the report, right?
16          A.    Yes.
17          Q.    And you've cited to 3405.1
18   and 3405.3; is that correct?
19          A.    Correct.
20          Q.    And that's the basis of your
21   opinion that undamaged roof trusses need
22   to be brought up to the current code; is
23   that correct?
24          A.    Yes

N.T. 196

1           Q.    And although you talked
2    about what code officials might or might
3    not do, you haven't had any specific
4    discussions with any code official about
5    the Windowizards' building?
6           A.    I have not, no. We're
7    pretty clear on what they need, and we're

33

8        also clear on what we're willing to --
9        what we have to do to make the building
10       properly safe and reinforced.
11              Q.      Per code, or just per your
12       own personal feelings as an engineer?
13              A.      Per code.

In defendant's citation of State Farm v. Holmes Products et. al., 165 Fed. Appx. 182 (3d Cir. 2006) State Farm's cause and origin expert in this subrogation action was precluded from testifying that the family dog "probably" knocked over a halogen lamp causing the curtains to catch fire. The behavior of the insureds' dog was not supported by any scientific analysis or methodology and so the expert's unsupported opinion that the dog knocked over the lamp was properly excluded.

Mr. Honig's opinions are not based on unsupported speculation or the behavior of household pets and defendant's citation is completely unpersuasive on the issue.

In defendant's citation of Simmons v. Ford Motor Co., 132 Fed. Appx. 950 (3d Cir. 2005) the plaintiff claimed that her Lincoln Navigator spontaneously shifted out of park causing her personal injuries. Plaintiff alleged a design defect in the subject vehicle caused its park gear to spontaneously disengage. The District Court precluded the plaintiff's expert from testifying because, inter alia, he failed to provide a testable hypothesis and was never able to duplicate a scenario where the weight of the vehicle in combination with "false park" caused the vehicle to move. In addition, under New Jersey law, which governed the case, in a defective design case the plaintiff must prove that a practical and feasible alternative design would have reduced or prevented the harm. The expert testimony failed to meet this threshold. This design defect case does not support granting the relief sought by defendant in this case.

Defendant's reliance on Oddi v. Ford Motor Co., 234 F. 3d 136 (3d Cir. 2000) is similarly misplaced. Oddi involved a crashworthiness claim which contains its own

34

safer design that was practical existed; a description of the injuries plaintiff would have received had the alternative design been used; and, that the defective design exacerbated the plaintiff's injuries. The plaintiff's expert was precluded because he conducted no tests, failed to attempt to calculate any of the forces on the subject vehicle during the accident and utilized little methodology beyond his own intuition.

As the Court may anticipate, the defense engineer disagrees with Mr. Honig on the number of trusses damaged in the loss and that the undamaged trusses need to be reinforced and brought up to Code. As the Court noted in Larson v. Bondex, 714 F. Supp. 2d 535, 547 (E.D. Pa. 2010), (cross Daubert challenges to opposing experts on the issues of causation, asbestos and cancer), "If disagreements on particular points between proposed experts and others in their filed were a proper basis for questioning the reliability and relevance of the methods employed by the experts, it is likely that very few expert opinions would be admissible at trial."

Although defendant does not agree, Mr. Honig has given "good grounds" for his opinions and his methodology is reliable. His opinion on the need to reinforce the trusses in the building not damaged by snow load should not be precluded.

WHEREFORE, plaintiffs pray that defendant's Motion in Limine be denied.

> RESPECTFULLY SUBMITTED,
> HARRINGTON & CALDWELL, P.C.
> Attorneys for Plaintiffs
>
> By:_____
> ROGER J. HARRINGTON, ESQUIRE
> PA Identification No.: 09885
> 1617 John F. Kennedy Boulevard
> One Penn Center, Suite 1055
> Philadelphia, PA 19103
> Office@harringtoncaldwellpc.com
> (215) 751-1135
> (215) 751-1147

IN IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WINDOWIZARDS, INC.,<br>HARVEY GOODMAN, Partner and<br>MOORE STREET ASSOCIATES | )<br>)<br>)<br>) | NO.:  2:13-CV-07444-EL |
| v. | )<br>) | |
| CHARTER OAK FIRE INSURANCE<br>COMPANY, Member of Travelers Group<br>of Insurance Companies | )<br>)<br>)<br>) | |

## CERTIFICATION OF SERVICE

I, Roger J. Harrington, Esquire certify that I caused Plaintiffs" Answer To

Defendant's Motion In Limine To Preclude Testimony Of Certain Of Plaintiffs' Expert

Witnesses to be sent by way of electronic mail on this date to:

Thomas S. Brown, Esquire
Michael J. McLaughlin, Esquire
Butler Pappas Weihmuller Katz Craig, LLP
1818 Market Street
Suite 2740
Philadelphia, PA  19103

RESPECTFULLY SUBMITTED,
HARRINGTON & CALDWELL, P.C.
Attorneys for Plaintiffs

Date: 4-17-15                          By: _____
ROGER J. HARRINGTON, ESQUIRE
PA Identification No.:  09885
1617 John F. Kennedy Boulevard
One Penn Center, Suite 1055
Philadelphia, PA  19103
Office@harringtoncaldwellpc.com
(215) 751-1135
(215) 751-1147